**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

**KENNETH PRITCHARD,**
**11146 Beacon Way**
**Lusby, MD 20657,**

        **Plaintiff,**

    **v.**

**Metropolitan Washington Airports**
**Authority,**
**1 Aviation Circle**
**Washington, DC 20001,**

        **Defendant.**

**Case No.**

**Jury Trial Demanded**

## COMPLAINT

1.      Plaintiff, Kenneth H. Pritchard ("Plaintiff"), brings this action against Defendant, Metropolitan Washington Airports Authority ("Defendant"), under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq.

2.      Plaintiff has been raising violations of Title VII with Defendant for over the course of many years.  Because his termination from employment violated Title VII and because of the hostile work environment he suffered due to his a prior protected EEO activity, Plaintiff should be reinstated to his position with back pay, benefits, and interest, and awarded all other relief allowed by law.

## Jurisdiction and Venue

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331; 42 U.S.C. § 2000e-5(f)(3).

1

4.     Defendant is headquartered at 1 Aviation Circle, Washington, DC 20001-6000. However, Defendant employed Plaintiff in this district and maintains its records of his employment in this district. Thus, venue properly lies before this Court pursuant to 42 U.S.C. § 2000e-5(f)(3).

5.     Plaintiff has met all jurisdictional prerequisites for filing this action, and this action is authorized to be filed here pursuant to 42 U.S.C. § 2000e–5(f)(3).

## Parties

6.     Plaintiff is a resident of the State of Maryland.  He was an employee of the Defendant from February 14, 1988 through February 7, 2017.   Plaintiff is a Caucasian male who, at all relevant times to this Complaint, has been older than forty years of age.

7.     Defendant is a public body, politic and corporate, and is independent of the District of Columbia, the Commonwealth of Virginia, and the federal government. For all periods relevant to this Complaint, John E. Potter has served as President and Chief Executive Officer of Defendant.

## Facts

### Plaintiff's Employment with Defendant

8.     Defendant was created by the District of Columbia Regional Airports Authority Act of 1985, as amended, and Chapter 598 of the Acts of Virginia General Assembly of 1985, as amended, for the purpose of operating, maintaining, and improving Reagan Washington National Airport and Washington Dulles International Airport. The Metropolitan Washington Airports Act of 1986, as amended, authorized the Secretary of Transportation to lease Reagan Washington National Airport and Washington Dulles International Airport to the Airports Authority.

2

9.      Plaintiff began his employment with Defendant on February 14, 1988, as an employee in the Organizational Analysis and Staffing Branch of the Administrative Services Division, which was later changed to the Office of Human Resources.[1]

10.     In 2002, Plaintiff became Manager, HR Policy, Strategy & Compensation Programs, Office of Human Resources and Administrative Services ("OHR").

11.     In his capacity as Manager, Plaintiff managed the Compensation Department which included the following main functions (for all or most of his tenure in this position):  HR policy and strategy, compensation, job evaluation/classification, organization analysis/review, position management, research/initiatives and special projects such as development of specifications for  reform of the employment system in the wake of the adverse management audit report of Office of the Inspector General of the Department of Transportation (DOT-OIG), November 1, 2012. In his position as Manager, Plaintiff formulated strategic initiatives, developed HR policies, programs or processes in various HR functional domains including compensation, employment, performance management and cross-functional HR areas such as the Exit Interview Program and the Exit Process, developed compensation policies, programs, guidelines and processes, led major cyclical and important, special focus pay studies, specified/developed/implemented and administered a new system (in response to the DOT-OIG report) of setting and validating minimum qualifications requirements and selection criteria, ensured compliance with the law, regulations, policies and programs,  and oversaw or performed daily market pricing work and job content reviews covering a full range of professional, administrative, trade and public safety jobs.

---

[1] The name of this office was later changed to the Office Human Resources and Administrative Services.

12.     During the periods relevant to this Complaint, Plaintiff directly oversaw or supervised between 3 and 5 positions/employees.

### *Proposed Removal & Removal*

13.     On January 19, 2017, Defendant – through Anthony J. Vegliante, Vice President, Office Human Resources and Administrative Services – proposed to terminate Plaintiff's employment with Defendant ("Proposed Removal") on allegations of misconduct.

14.     On February 7, 2017, Defendant – through Vice President Vegliante – terminated Plaintiff's employment from MWAA.

### *Proceedings before the U.S. Equal Employment Opportunity Commission*

15.     On August 2, 2017, Plaintiff – through counsel – filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").

16.     Plaintiff's EEOC charge alleged that MWAA discriminated against him by subjecting him to a hostile work environment and by terminating his employment due to his race, age, sex, and in retaliation for his protected EEO activities.

17.     On August 16, 2018, the EEOC issued a "Dismissal and Notice of Rights" to Plaintiff providing him with a Notice of Suit Rights ("Notice of Right to Sue").

18.     Plaintiff's counsel received the EEOC's Notice of Right to Sue on August 20, 2018.

### *Plaintiff's prior protected EEO activity[2]*

---

[2] For purposes of the instant Complaint, "prior protected EEO activity" refers to Plaintiff either opposing discriminatory actions or practices, and/or participating in proceedings involving claims of discrimination.

4

19.     Throughout his career with Defendant, Plaintiff brought violations of Title VII and other anti-discrimination laws to the attention of his superiors and other Defendant officials.

20.     Between 2010 and 2016, Plaintiff engaged in a series of activities protected by Title VII and other anti-discrimination laws to include his opposition to discriminatory practices and participation in internal EEO proceedings.

21.     In late 2016, Defendant hired an outside lawyer named Morris Kletzkin ("Investigator Kletzkin") to investigate allegations of misconduct regarding Plaintiff.

22.     In January 2017, during his interview with Investigator Kletzkin, Plaintiff informed him that Defendant was discriminating and retaliating against Plaintiff for his prior EEO activity by instigating the investigation.

23.     Throughout 2016, Plaintiff opposed discrimination prohibited by Title VII and other anti-discrimination laws as follows:

   a. In an HR Managers Meeting (January 2016), Plaintiff complained to Vice President Vegliante and all other key HR staff present that MWAA was granting special favors in employment and other HR domains to favored individuals and groups and that it needed to stop.
   b. Plaintiff complained to Vice President Vegliante several times in 2016 that Defendant was engaging in discrimination when it failed to downgrade key African American employees [Ms. Rita Alston (African American, female) and Steve Baker (African American, male)] whose jobs were identified as over-graded and thereby subject to a pay cap, whereas Defendant had downgraded and/or or abolished positions held solely or mainly by Caucasians, including Firefighter Technician and Assistant Fire Marshal positions, and thereby subjected them to a pay cap or a job loss.  Vice President Vegliante took no corrective action.
   c. Plaintiff complained to Vice President Vegliante in 2016 that Vegliante himself had directed preferential treatment in pay grade (and thus pay range or promotional pay increase) to positions of African American employees such as the first and second selectees for the Vice President, Diversity Supply job and Reggie Clark (African American, male) who served under Vice President Vegliante, and that Vice President Vegliante and Defendant CEO Potter had directed Plaintiff to adversely treat Valerie O'Hara (White, female) with regard to

5

her job's grade review and the potential (and actual) promotional pay increase (untimeliness).

d. Plaintiff informed Vice President Vegliante of the disparity in pay treatment between Ms. Robin Wade (African American, female), who was temporarily promoted in 2016 to a position with a higher pay grade for which Ms. Wade received higher pay, and Mr. Richard Golinowski (Caucasian, male), who had received a very similar temporary promotion to a position with a higher pay grade, but who did not receive higher pay.  Vice President Vegliante did not stop Wade's pay increase or make Mr. Golinowski whole, pay-wise.

e. Plaintiff informed Vice President Vegliante, beginning in Summer 2016 and culminating in November 2016, of adverse impact on women employees involving administration of the H COLA program. Most H-employee men had gotten timely pay increases or retroactive pay increases, but most H-employee women had not.

f. Plaintiff informed Defendant Board of Directors Board Member Mr. Anthony H. Griffin in October 2016 that Defendant was violating the requirements of federal grants and contracts, including the Rehabilitation Act, regarding Defendant's early and restricted recruitment for selected jobs before job descriptions (including qualification requirements) were made official or before vacancies were announced, and in its failure to post all job vacancies as required.

g. Plaintiff informed Vice President Vegliante in November 2016 that within the Office of Supply Chain Management there were four over-graded positions: three were encumbered by employees who were African American or Hispanic and the other was staffed by a Caucasian employee.  Vegliante stated that the only job that might be downgraded was the one staffed by the Caucasian employee. Plaintiff explained that all four jobs should be downgraded and that race of the incumbent was not a legal basis for different treatment.

24.     Throughout 2015, Plaintiff opposed discrimination prohibited by Title VII and other anti-discrimination laws by Defendant as follows:

a. Plaintiff informed Vice President Vegliante, and others (including Employment Counsel Heppen), at an HR Managers Meeting in January 2015, that Defendant was about to establish certification requirements for subprofessional procurement staff that were inconsistent with (that is, was significantly higher level than) the content of their jobs and were known (based on earlier requirements at MWAA) to have adverse impact on minority staff.  Defendant established the requirement anyway and an African American, female employee was terminated in violation of Title VII for failing to obtain a certification that was known to be adverse-in-impact and was not job-related and consistent with business necessity.

b. Plaintiff informed Vice President Vegliante intermittently throughout 2015 that his (Vice President Vegliante's) efforts to direct certain positions be created or

graded a certain way in order to favor African American male and female employees violated Title VII;

c. Plaintiff informed Vice President Vegliante intermittently throughout 2015 that Defendant was violating Title VII with respect to bona fide occupational qualification determinations.

d. Plaintiff informed Vice President Vegliante in March 2015 that Defendant was violating Title VII when Vegliante himself took race into account to direct the setting of a management job's qualification requirements (1) at a level lower than determined appropriate through job analysis by the Compensation Department using the Defendant's own qualifications-setting system and through content and needs analysis by the line manager over the job and (2) inconsistent with the Defendant's own succession planning process, all to enhance the career of a specific African American, male employee (Zachary Coleman) who was promoted into the job he would not have been qualified for absent the intervention by Vegliante.

e. Plaintiff informed Vice President Vegliante in November 2015, that Defendant was violating, or potentially violating, Title VII by advertising certain positions in ways that could favor or disfavor individuals by sex or race.

f. Plaintiff informed Vice President Vegliante intermittently throughout 2015 (continuing from 2014) that Defendant was violating, or possibly violating, Title VII when Vice President Vegliante and others under his supervision (1) stated openly Defendant's intent "to hire minorities" in certain jobs and (2) then made in 2015 (and would make in 2016) highly focused outreach to ensure hiring of high numbers of African Americans and marginalize chances for hiring of Caucasians under the guise of diversity for three new hiring initiatives and one on-going hiring effort. For each of these initiatives/efforts, the hires made in 2015 and in 2016 were widely out-of-proportion to (3) the demographics of applicant supply in the greater Washington, DC area and (4) the actual pool of qualified applicants, by-race.

g. Plaintiff cautioned Vice President Vegliante when he made prejudicial comments in 2015 (continuing from 2014) about Whites in certain Defendant jobs (including trade and public safety jobs) with respect to his stated intent to hire fewer Whites and more minorities into these jobs such as: "male, pale and stale" and "West Virginia mafia".

h. Plaintiff informed Vice President Vegliante in November-December 2015 that Defendant was violating, or potentially violating, Title VII when it recruited for positions (and actually selected some new hires for said positions) prior to approval of the vacancies by Defendant's Board of Directors and before official job descriptions (and qualifications requirements) were established.

25.     Throughout 2010-2014, Plaintiff also disclosed numerous violations of Title VII

and other anti-discrimination laws committed by Defendant to various Defendant's officials,

including: Arl B. Williams, former Vice President for Human Resources; Vegliante, Vice

President; Mr. Potter;  Deborah Lockhart, former Employment Manager; Tanisha Lewis, who

served in various capacities in the OHR during this period; Warren Reisig, former Manager,

Benefits and Retirement; Michael Brogan, former Manager, Organization Development

Department; Margaret McKeough, Executive Vice President and Chief Operating Officer; Philip

Sunderland, General Counsel; Joseph E. Kalet, former Defendant Employment Counsel; Bruce

Heppen, Employment Counsel; and Henry Morris, Defendant's outside counsel.

### *Hostile Work Environment*

26.     Defendant created a hostile work environment in retaliation for Plaintiff's

protected EEO activity.

27.     From 2010 through the date of his termination, Defendant subjected Plaintiff to a

hostile work environment, to include the following actions (among others):

  a. Defendant diminished Plaintiff's job in scope, effect, and level by eliminating,
     constricting and/or inhibiting administration of functions, duties, responsibilities,
     programs, authorities and other key elements of job content, or declaring the
     intent to eliminate them.  Examples:
       i. In May 2011, Vice President Williams falsely alleged an ethics-in-
          contracting violation by Plaintiff, threatened to remove Plaintiff from his
          duty of Contracting Officer's Technical Representative (COTR) over the
          compensation contractor (HumRRO) because of it and otherwise harassed
          Plaintiff.
       ii. Vice President Williams eliminated (in setting Plaintiff's 2012
           performance management goals and expectations) the cross-functional HR
           program design and development function from Plaintiff's job (April 24,
           2012), a function which Plaintiff had performed for over a decade.
       iii. In June-July 2012, Vice President Williams threatened to transfer
            administration of the Exit Interview Program (EIP) from the
            Compensation Department to Employment Manager Lockhart. Plaintiff
            had led design and development of the EIP (as a cross-functional HR
            program) in coordination with a contractor and a staff member and the
            Compensation Department had administered the EIP since implementation
            in 2008.

    iv.  Vice President Williams directed Plaintiff (under threat of adverse action due to "insubordination") not to advise or provide work products to any Compensation Department customer without Williams' prior review and approval.  In addition, Plaintiff was required to submit *busy work* papers in support of every work product including the simplest forms PE-10 (personnel action processing forms).  By memo (dated June 21, 2012) establishing this work regimen, Plaintiff's *required-by-management* manner of work performance was reduced to the level of a basic trainee and Plaintiff was otherwise subjected to extraordinarily close supervision; thus, professional level work was shredded from Plaintiff's job.

    v.  CEO Potter told Plaintiff (March 23, 2013) to "stop acting like an auditor" when Plaintiff reported inequitable pay treatment of an African American male employee (John Jackson) in violation of Title VII to CEO Potter.

b.  Defendant management excluded Plaintiff from meetings and denied Plaintiff information needed to do his job.  Examples:

    i.  In October 2010, Vice President Williams disinvited Plaintiff from the Human Capital Workgroup of the L&L Study.

    ii.  Vice President Williams and Manager Lockhart denied Plaintiff information about a reorganization of the Office of IT and Telecommunications in April-May 2011, thus precluding/delaying analysis of impact on the position structure; in addition, they created a false email thread to falsely accuse Plaintiff of being unresponsive to the Office of IT and Telecommunications.

    iii.  Beginning in August 2010, Vice President Williams reduced the flow of forms PE-10 (which contain work information and work tasks) to the Compensation Department on a case-by-case basis. Vice President Williams further reduced the flow of PE-10 based work information and other work-essential information such as reorganization information in 2011 and 2012 until his retirement in November 2012.

    iv.  Vice President Williams, with assistance of Employment Manager Lockhart, denied access of Plaintiff and subordinate employee Endicott to the HR Information System (Ceridian) from June 2011 to December 2012 despite repeated protests by Plaintiff to CEO Potter in 2012 that lack of access adversely affected work.

    v.  At several points in 2011, Vice President Williams excluded Plaintiff from numerous meetings relating to Plaintiff's work, including, but not limited to, HR Managers Meetings in May and June 2011.

    vi.  From January to March 2013, CEO Potter and Chief Operating Officer McKeough denied Plaintiff information about their decision to reallocate positions although Plaintiff needed this information for job description actions in support of customers.

    vii.  During July and August 2013, recently appointed Vice President Vegliante restricted the flow of PE-10s to the Compensation Department.

viii.   In June 2013, Vice President Vegliante denied Plaintiff participation in key policy deliberations/decisions and drafting of revision of Overtime Pay policy (a decade+ functional area of Plaintiff) from June through August 2013.

ix.   Vice President Vegliante kept Plaintiff in-the-dark about revision of Holiday Pay policy (a decade+ functional area of Plaintiff) and compressed work schedules until issuance of a memo to "All Employees" (August 23, 2013).

x.   Vice President Vegliante excluded Plaintiff from meetings that shaped the design parameters of a new pay link to a new performance management system (the PfP) from July to December 2013, thus complicating re-design of the final pay link (though Plaintiff, beginning in 2001, had done initial and final designs of all predecessor pay links to all predecessor performance management systems).

xi.   Vice President Vegliante excluded Plaintiff from meetings between June and October 2013, regarding work (positions) and workforce planning in support of the Office of Technology which were necessary for Plaintiff to attend to performance of his duties such as job descriptions, including qualification requirements, and position structures.

xii.   In 2014, Vice President Vegliante withheld critical information from Plaintiff and staff member Delate concerning a reorganization of the Corporate Risk and Strategy unit, thus delaying their work on job design and grading issues and not permitting Plaintiff to review/recommend alternate unit designs (a decade+ function of the Compensation Department).

xiii.   In 2015, Vice President Vegliante withheld information from Plaintiff and staff member Delate about professional certifications required by the Federal Transit Administration on the Rail Project, and about realignments of work in the Office of Technology including H-to-S job transitions (all of which was core work of the Compensation Department.)

xiv.   In 2016, Vice President Vegliante withheld critical information from Plaintiff concerning the interface of his work on the Living Wage policy project (in support of Defendant Board Member Griffin) and the work of other key members of the project team (who else was on the team and assigned what roles and responsibilities).

c.   Defendant transferred Compensation Department work to non-Compensation Department staff and, typically, Defendant failed to inform Plaintiff about such assignments throughout 2010-2016.  During this period, Defendant gave (1) work of the Compensation Department (i.e., involving pay actions, pay policy, etc.), (2) classification work (i.e., involving job description-grading-titling-qualification setting and job evaluation policy), and (3) organization review and analysis work (i.e., concerning interrelationships of positions and structures of positions) to non-Compensation Department staff.  Conversely and for example, Defendant did not

transfer the work of other departments within the Office of Human Resources to the Compensation Department.

d. Defendant management sabotaged and refused to recognize the work of Plaintiff (and his staff).  Examples:
   i. In 2010, Vice President Williams refused to review, and to release for review by COO McKeough, the Strategic Human Capital Plan (SHCP) Plaintiff had drafted and then lied in Plaintiff's performance appraisal that Plaintiff had failed to finish the draft for McKeough's review.
   ii. In 2012, Vice President Williams refused to review the work of the Compensation Department in contravention of his own process requirements memo (of June 2012 that levied onerous work review requirements on Plaintiff), including cancelling meetings with Plaintiff and falsely claim that he was unable to open work files Plaintiff had emailed to him.
   iii. During 2015-2016, Vice President Vegliante and Chief Operating Officer McKeough refused to recognize the accomplishments of Plaintiff and staff member Robinson with respect to the multi-faceted Transportation Network Company (TNC) project.

e. Defendant denied Plaintiff the in-house staff personnel and/or contractor assets to do his job, and/or thwarted his efforts to obtain/use these personnel/assets. Examples:
   i. Between 2010 and 2012, Vice President Williams would not permit Plaintiff to fill the sole senior level (S21) position in the Compensation Department, which had been authorized for many years and had become vacant in 2004.  In April 2012, Vice President Williams told Plaintiff he would be taking away the senior level position and allocating it to another unit in OHR.
   ii. In August and September 2012, Vice President Williams refused to extend the contract of the compensation contractor (HumRRO) for support of the Compensation Department despite the fact that ongoing contractor support had been deemed essential for several years prior to 2012 (partly due to the ongoing vacancy in the Compensation Department's senior level position).
   iii. In August 2012, Vice President Williams reassigned staff member Ms. Howard from the Compensation Department to his own staff thereby reducing Plaintiff's staff of 2 by 50 percent to 1 fulltime subordinate.

f. Defendant management reduced Plaintiff's level in the organizational hierarchy and otherwise lowered his job status.  Examples:
   i. In June 2012, Defendant CEO Potter and Vice President Williams reduced Plaintiff's level from a department manager (directing reporting to the Vice President for HR) to a division supervisor indirectly reporting to the Vice President for HR through the Benefits and Retirement Manager.

This reduction was implemented in stages, with Potter reiterating his support of it as late as October 2012.  Ultimately and likely as a result of the release of the report by DOT-OIG in November 2012, this reduction in Plaintiff's standing was rescinded in November 2012.

ii.  In September 2012, Vice President Williams removed Plaintiff from the Management Forum, which is a group that includes all members of Defendant management.

iii. In 2013, Defendant CEO Potter submitted official function statements to the Defendant Board that reduced Plaintiff's organizational rank from department manager to division manager (the very hierarchical reduction that had been rescinded in November-December 2012).

g.  Defendant management gave Plaintiff undue performance evaluations in terms of (a) false and derogatory statements in the evaluation text and (b) low (undue) annual summary ratings; annual summary ratings drive annual pay increases at Defendant. Between 2010 and 2017 (for 2016), Defendant issued Plaintiff several lower than normal performance evaluations; in 2017 (for 2016), Plaintiff failed to follow its own procedures in the rating process.  These evaluations included false information regarding Plaintiff's performance and failed to accurately assess his work.  As a result, Plaintiff received lower than warranted performance awards or no performance award at all.

h.  Defendant management demeaned Plaintiff, called him names, spread false rumors about him, made false accusations against him, physically punished him (by requiring manual labor of him), physically intimidated him and otherwise disparaged and harassed him.  Examples:

i.   Between 2010 and 2012, Vice President Williams, by email and/or face-to-face, called Plaintiff a "hypocrite", a complainer and called upon Plaintiff to demote himself from manager to "a less demanding role."

ii.  Another Defendant manager Clarence Brown (a directly reporting aide to Vice President Williams) told one of Plaintiff's co-workers (Marcelene Wesley) that Plaintiff was "crazy" and said, "What planet is that boy from?"

iii. Vice President Williams told Plaintiff in an email in July 2012, that he (Plaintiff) has "limited comprehension."

iv.  Defendant CEO Potter told one of Plaintiff's co-workers – Ms. Debbie Williams – that he used to think Plaintiff was "crazy."

v.   On October 19, 2016, Defendant CEO Potter barged into a private meeting Plaintiff was having with Defendant Board Member Griffin, strode well into the room and stood closely behind and over Plaintiff (as he was going through slides on the table), which silenced Plaintiff until Defendant CEO Potter left the room.

vi.  In January and February 2017, Defendant management falsely accused Plaintiff of bullying a subordinate (Ms. Endicott), making her sick,

"repeatedly" screaming at subordinates and otherwise being verbally abusive and violent, stealing ("pilfering") Defendant documents, and so forth.

i.  Defendant management refused to reimburse Plaintiff for a *pre-approved* employee-on-travel business expense in August 2010 (paid Internet access at a hotel).  This expense had been pre-approved by Mr. Brogan when he was serving as Acting Vice President for OHR.

j.  Defendant ended Plaintiff's temporary pay increase 5.5 months early in 2012.  In August 2010, Vice President Williams cancelled Plaintiff's temporary pay increase prematurely.

k.  Defendant cancelled Plaintiff's *pre-approved* attendance at three training-seminar events in August 2010.

l.  In August 2012, Defendant Chief Operating Officer McKeough threatened to outsource Plaintiff's job and those of his staff ("all of Compensation"); one directly implied threat was to terminate Plaintiff and all of his staff.

m.  Defendant management removed the FLSA-exempt content from Plaintiff's job in the summer of 2012 – job content that met the Administrative Exemption or the Executive Exemption criteria.  Administrative Exemption content was removed in June and July and all pretense of the Executive Exemption content was removed in August.  (Exempt content was fully restored only after the DOT-OIG management audit report was published in November 2012.)

n.  Defendant management refused to pay all the overtime pay due to Plaintiff as a non-exempt employee for all of his overtime work in 2012 (after the FLSA-exempt content had been removed from Plaintiff's job).

o.  On May 30, 2013, newly appointed Vice President Vegliante threatened to make Plaintiff pay back the overtime pay he had received in 2012.

p.  In July 2012, Defendant management publicly humiliated Plaintiff (which served to intimidate others) and separated him from Compensation Department staff by forcing him to move from his office in the suite with the Compensation Department staff to a much smaller office next door to Vice President Williams and away from Plaintiff's staff; Defendant forced Plaintiff to perform heavy manual labor in this move.  Plaintiff was ultimately permitted to return to his office in proximity to Compensation Department staff in April 2013, only after Plaintiff complained to Defendant CEO Potter for the second time about being separated from his staff.

q.  Defendant denied Plaintiff prestigious and rare internal leadership and training opportunities in 2012 ("Ready Now VP") and 2015 ("Succession Planning/Leadership Development Program").

r.  In 2012 and 2013, Defendant subjected Plaintiff (and other employees who had helped oppose some of the management wrongdoing in 2011 and 2012) to secretive internal investigations to find individuals who provided information to the DOT-OIG, the FBI, the Washington Post, the Washington Examiner and other news organizations regarding wrongdoing by Defendant in 2012 and 2013.

s.  In November 2016, Defendant placed Plaintiff on Administrative Leave, which cut him off from (a) his staff, (b) his work (including administration of mission-critical merit pay processes that comprise a key job function and evaluation of staff member performance) and (c) annual self-evaluation of this own annual work performance.

t.  Defendant destroyed, discarded or refused to return Plaintiff's personal property to him.  This began in early January 2017 when agents of Vice President Vegliante working under the supervision of Labor Relations Manager Robin Wade began going through Plaintiff's work documents and personal property and discarding-destroying most of his personal property to include dozens of boxes of personal documents and irreplaceable personal mementos from Plaintiff's military service.

28.  Defendant was aware of these activities and took no action to prevent or correct these actions.

## COUNT I

### Retaliation
### Termination

29.  Plaintiff repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

30.  Title VII prohibits an employer from discriminating against any of its employees because the employee has opposed an unlawful discriminatory practice, or because the employee has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII. *See*, 42 U.S.C. § 2000e-3(a).

31.  Plaintiff engaged in protected activity when he provided information to Defendant's EEO investigator concerning a complaint of race and sex discrimination filed by Andrea Bickley.

32.     Plaintiff also engaged in protected activity at various times in each of the years 2010 through 2016, when he alerted Defendant's officials to the discrimination and retaliation to which he and others were being subjected.

33.     From 2010 through February 7, 2017, Defendant's officials have reasonably been aware of Plaintiff's protected EEO disclosures and his other protected EEO activities.

34.     Defendant engaged in unlawful reprisal when it terminated him from employment effective February 7, 2017.

35.     Based on the above, Defendant violated Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e-3(a).  As a direct and proximate result of Defendant's conduct as set forth, Plaintiff has suffered actual and compensatory damages, including back pay, front pay, and loss of benefits within the jurisdictional limits of this Court.  Plaintiff will further show that Defendant's conduct as alleged was willful, entitling Plaintiff to additional liquidated damages as well as any additional damages to the extent provided under Title VII.

## COUNT II

### Race and Sex Discrimination
### Termination

36.     Plaintiff repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

37.     Title VII prohibits an employer from discriminating against any of its employees because of the employee's race or sex.

38.     Defendant terminated Plaintiff due to his race and sex.

15

39.     Defendant employed Ms. Deborah Lockhart as Employment Manager, Human Resource Information Systems, Office of Human Resources & Administrative Services.

40.     For all periods relevant to the instant Complaint, Ms. Lockhart and Plaintiff had the same supervisory chain.  As such, Ms. Lockhart and Plaintiff were peers.

41.     Ms. Lockhart is African American and female.

42.     Plaintiff is Caucasian and male.

43.     Defendant failed to discipline or terminate Ms. Lockhart despite her having engaged in misconduct far more egregious than that which Plaintiff was accused.[3]

44.     Upon information and belief, Ms. Lockhart engaged in the following misconduct: violated Defendant's code of ethics by engaging in nepotism in hiring (her own relatives) and facilitating and approving nepotism in hiring by other managers and high-echelon officials; improperly used employees as personal shoppers/servants; required two new hires to her own staff to work without pay (and thus violated the FLSA); ignored an employee's complaint of continuing FLSA violation; engaged in conduct that compromised the safety and security of the airports through improper acceptance of incomplete or missing background checks while serving as the appointing official for these new hires; rigged selection panels (for hiring and promotion) to skew the outcome to the benefit of favored individuals or groups (and thus violated Title VII); was verbally and otherwise abusive to subordinates to the point of forcing those employees to seek, and quit for, employment elsewhere and to resign or retire; falsely reported employment statistics and other workplace data used by high-echelon officials; committed time and attendance fraud (for herself and others); committed health benefits plan abuse by seeking to

_____

[3] Plaintiff does not concede that he engaged in the misconduct alleged in the Proposed Removal.

16

cover, and obtaining coverage of, an ineligible family member; improperly set pay to favor employees by race; manipulated hiring processes to improperly favor the hiring and promotion of career and temporary employees on the basis of race; abused the temporary services contract hiring process to favor the hiring of temporary service workers for Defendant on the basis of race; supported nepotism and contravened equity in contracting; benefitted financially from a contract/contractor she used on a recurring basis; and committed other violations of ethics, federal employment law, merit staffing and merit contracting processes.

45.     Defendant's officials – in particular Vice President Vegliante, Mr. Sunderland, Mr. Kalet, Mr. Potter, Ms. McKeough and Elmer Tippett (former Vice President for Public Safety) – were aware of Ms. Lockhart's misconduct.

46.     Despite Ms. Lockhart's egregious misconduct, Defendant's officials –CEO Potter and Vice President Vegliante – did not terminate Ms. Lockhart or take major disciplinary action against her.

47.     In terminating Plaintiff and not terminating Ms. Lockhart for engaging in much worse, much longer-term misconduct, Defendant discriminated against Plaintiff based on his race and sex.

48.     Based on the above, Defendant violated Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e-2, *et seq*.  As a direct and proximate result of Defendant's conduct as set forth, Plaintiff has suffered actual and compensatory damages, including back pay, front pay, and loss of benefits within the jurisdictional limits of this Court.  Plaintiff will further show that Defendant's conduct as alleged was willful, entitling Plaintiff to additional liquidated damages as well as any additional damages to the extent provided under the Title VII.

## COUNT III

### Retaliation
### Hostile Work Environment

49.     Plaintiff repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

50.     Plaintiff reported violations of Title VII and other anti-discrimination laws to Defendant's officials throughout the period 2010 through the date of his termination.

51.     Defendant's actions toward Plaintiff created a hostile work environment due to Plaintiff's protected EEO activity.

52.     By and through its officials, Defendant was on notice of the retaliatory hostile work environment to which Defendant subjected Plaintiff.

53.     By taking the retaliatory actions against Plaintiff, Defendant created a hostile work environment for Plaintiff.

54.     The retaliatory actions taken by Defendant against Plaintiff were unwelcome.

55.     Defendant's retaliatory actions against Plaintiff were sufficiently severe and pervasive to create an abusive working environment in which Plaintiff was humiliated and physically threatened, and which interfered with Plaintiff's work performance.

56.     Plaintiff was subjected to the harassment because of his prior EEO activity and it affected a term, condition or privilege of Plaintiff's employment.

57.     Defendant failed to adequately investigate the harassment of Plaintiff and took no remedial action.

58.     Based on the above, Defendant violated Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e-2 and 2000e-3.  As a direct and proximate result of Defendant's conduct as set

forth, Plaintiff has suffered actual and compensatory damages, including back pay, front pay, and loss of benefits within the jurisdictional limits of this Court. Plaintiff will further show that Defendant's conduct as alleged was willful, entitling Plaintiff to additional liquidated damages as well as any additional damages to the extent provided under Title VII.

## PRAYER FOR RELIEF

Plaintiff seeks the following relief:

A.    Declaratory relief that the acts and practices described in this complaint are unlawful in violation of Title VII;

B.    Preliminary and permanent injunctive relief to restore him as nearly as possible to the position he would have held had the prohibited personnel practices not occurred;

C.    Equitable relief to ensure that Defendant's workplaces are free from unlawful discrimination and retaliation by directing Defendant to take such affirmative action as is necessary to ensure that the effects of those unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment and advancement opportunities;

D.    Back pay plus interest and related benefits, medical costs incurred, travel expenses, and any other reasonable and foreseeable consequential damages;

E.    Compensatory damages (including interest, reasonable expert witness fees, and costs);

F.    Costs of this action, including reasonable attorneys' fees;

G.    Such other and further relief as this Court finds just and proper.

Respectfully submitted,

Date: November 19, 2018

/s/ Nina Y. Ren
Nina Ren
nren@kcnlaw.com
Va. Bar No. 86434
Kalijarvi, Chuzi, Newman & Fitch, P.C.
818 Connecticut Ave., NW, Suite 1000
Washington, DC 20006
(202) 331-9260 office
1-877-527-0446 fax
*Attorney for Plaintiff*

JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Respectfully submitted,

/s/ Nina Ren
Nina Ren
Va. Bar No. 86434
*Attorney for Plaintiff*