

FRIEDLANDER MISLER
Established 1964
ATTORNEYS AT LAW
5335 WISCONSIN AVENUE, NW
SUITE 600
WASHINGTON, DC 20015-2045
TEL. 202.872.0800
FAX 202.857.8343

Morris Kletzkin
mkletzkin@dclawfirm.com

**CONFIDENTIAL**
**Attorney/Client Privilege**
**Work Product Privilege**

January 17, 2017

Mr. Philip Sunderland, VP & General Counsel
Mr. Bruce Heppen, Associate General Counsel
Metropolitan Washington Airports Authority
1 Aviation Circle, MA-22B
Washington, D.C. 20001-6000

Re: *Administrative Investigation into the Conduct of KP*
*Task Order No. 1-12-C254-T005*

Dear Counsel:

On or about November 2, 2016, Gail Endicott, a Metropolitan Washington Airports Authority ("Airports Authority") employee assigned to the Compensation Group (MA-540), contacted Robin Wade, Manager, Labor and Employment Group (MA-550), and reported a course of conduct and a series of troubling events that involved her direct supervisor, Kenneth Pritchard, Manager of the Compensation Group (MA-540).

Ms. Endicott reported that she "couldn't take it any longer" and that her physical and mental health were deteriorating. Specifically, she complained that Mr. Pritchard's repeated hostility; intemperate, profane, and threatening remarks; and disparagement of others, was the cause of her physical and mental deterioration. She related a series of events, a course of conduct, and a management style, which, if true, is a violation of the Conduct and Discipline Directive and, arguably, the Workplace Violence Directive.

Ms. Wade conducted a preliminary investigation after interviewing Ms. Endicott, and obtained relevant emails and correspondence directly from her. At the request of Anthony Vegliante, Vice President of Human Resources, the Airports Authority's General Counsel opened an administrative investigation. The conduct of that investigation was assigned to outside counsel, namely, the undersigned.

Pending the outcome of the investigation, Management determined that Mr. Pritchard should be placed on administrative leave with pay. Administrative leave commenced on November 29, 2016.

EXHIBIT
2
JAK 8/6/19




Counsel initiated the investigation by interviewing Ms. Wade and Mr. Vegliante. Ms. Wade summarized the complaint and facts she had gathered in her initial investigation and Mr. Vegliante reported the discussions he had had with Mr. Pritchard about being a productive member of the management team. Ms. Wade stated that she had not received any prior employee complaints regarding Mr. Pritchard's alleged hostile, intimidating or threatening conduct toward other Airports Authority employees. Mr. Vegliante reported that he counseled Mr. Pritchard shortly after Mr. Vegliante became Vice President of Human Resources in connection with a complaint that was voiced by Deborah Lockhart.

As a result of reviewing documents provided and discussions with General Counsel's office, fourteen employees were scheduled to be interviewed.

**Summary of Complaint**

The Conduct and Discipline Directive prohibits Airports Authority employees from engaging in bullying, aggressive outbursts, or hostile behavior that creates a reasonable fear of injury or causes another individual emotional distress. Section 2.3(a)(1) prohibits offensive conduct. Section 2.3(a)(10) prohibits offensive language. Section 2.3(a)(11) prohibits bullying and intimidation. Section 2.3(a)(15) prohibits the use of one's position at the Airports Authority to subvert policies and procedures, and Section 2.3(a)(8) prohibits insubordination.

Section 5(b) of the Workplace Violence Directive, prohibits behavior in the workplace "that results in violent, harassing, intimidating . . . or other disruptive behavior that communicates a direct or indirect threat of emotional harm or disruption of Airports Authority business operations."

**Executive Summary**

It seems clear from the evidence adduced to date that Mr. Pritchard is, and has been, very angry and frustrated with most, if not all, of the managers at the Airports Authority. His anger and frustration stem from his belief that things are not being done correctly, and that the executive management is violating federal and state law, as well as Airports Authority rules and regulations. Mr. Pritchard's anger is expressed not only to those in the Compensation Group, but to anyone who is willing to listen. Indeed, Mr. Pritchard seems to take pleasure in pointing out mistakes and shortcomings of his fellow managers on a regular and routine basis. Mr. Pritchard's anger and outbursts have caused his fellow employees discomfort and they avoid him when possible.

Mr. Pritchard's obsession and hatred of the executive management of the Airports Authority is no secret. Two of the five Compensation Specialists report that Mr.



Pritchard's behavior makes them uncomfortable and is unprofessional. The other Compensation Specialists confirm Mr. Pritchard is loud and sometimes demonstrates aggressive behavior, but either claim it is not disruptive or that they ignore it. Two of Mr. Pritchard's direct reports have asked him to calm down, have closed their doors at times to avoid listening to him, or have asked him to stop the behavior.

While Mr. Pritchard has manifested this behavior for many years, the level of his opprobrium seems to have increased in the past year with respect to at least one Airports Authority employee, which resulted not only in emotional distress, but caused physical symptoms.

The evidence obtained, both from interviews and documents, supports the conclusion that Mr. Pritchard has repeatedly engaged in conduct that can be described as offensive, intimidating and disruptive. Witnesses confirm that he routinely yells at his subordinates; curses; aggressively gesticulates; and derides, denigrates, and disrespects his fellow managers and the Airports Authority executive leadership. His behavior has caused his subordinates discomfort, illness and emotional distress. Moreover, he has no respect for Mr. Vegliante or Mr. Potter. It is the conclusion of the investigator that Mr. Pritchard has violated Sections 2.3(a)(1), 2.3(a)(10), 2.3(a)(11), 2.3(a)(8), and 2.3(a)(15) of the Conduct and Discipline Directive[1].

## Details of the Investigation

The following individuals were interviewed in connection with this investigation.

### Complaining Witness

Gail Endicott, the "Complaining Witness," was interviewed on November 30, 2016, and again on December 16, 2016. The Complaining Witness reports that Mr. Pritchard's loud, boisterous, and dramatic behavior, while always present, has become more routine and regular in the past year. The Complaining Witness is a nine-year veteran of the Airports Authority Compensation Department, and was hired by Mr. Pritchard in 2007. The Complaining Witness came to work at the Airports Authority when Arl Williams was Vice President of Human Resources. It quickly became apparent to her that Mr. Pritchard and Mr. Williams did not get along. She reports that Mr. Pritchard was investigating Mr. Williams and that he received assistance from others in the HR Department in this investigation. The Complaining Witness reports Pritchard would pay overtime to

[1] The charge of insubordination and abuse of his position developed during the course of the investigation as a result of multiple reports that Mr. Pritchard had repeatedly disparaged his supervisors and had engaged in conduct that abused his position as a Manager of the Airports Authority.

employees to follow up on Mr. Williams[2]. When Mr. Williams was terminated from his position, she reports that Mr. Potter became the Acting Vice President of Human Resources. For approximately four to five months, Mr. Pritchard mostly behaved. When Mr. Vegliante became Vice President of Human Resources, Mr. Pritchard soon became obsessed with what has been described as the "Postal Service connection." There quickly developed a "Postal Service v. Us" dynamic. She described Mr. Pritchard as being obsessed with Mr. Vegliante, and especially with any changes he was attempting to make to the HR operations of the Airports Authority. Mr. Pritchard's fixation was often repeated in statements that he was "going to get them." It became increasingly more upsetting to the Complaining Witness, and she advises that she spoke to Mr. Pritchard about her concerns.

Approximately a year ago, after what the Complaining Witness described as one particular intemperate outburst, Mr. Pritchard screamed that he "hates these people," that he was going to be a "thorn in their side," and that he was going to "get them." The Complaining Witness states that she told him he needed to let the hate go so that everyone could move on with their jobs. Notwithstanding this advice, Mr. Pritchard's behavior continued and became worse in the opinion of the Complaining Witness.

The Complaining Witness states Mr. Pritchard routinely yells, slams doors, and stomps about his office. She reports that his behavior has recently become more intimidating, and that he has become louder and more offensive. In one meeting, he referred to one of the Compensation Specialists as a "son-of-a-bitch." In another meeting with the Complaining Witness, he started screaming at her and another Compensation Specialist to "stop, stop, stop."

The Complaining Witness reports that staff meetings were routinely conducted with profane language, cursing at individuals, intimidating glares and profane gestures made in the direction of the third floor.

The Complaining Witness describes a meeting where the entire Compensation Department was invited to discuss an HR initiative. Four Compensation Specialists appeared at the agreed-upon meeting time, but Mr. Pritchard was approximately ten minutes late. After he arrived late to the meeting, Mr. Pritchard ordered the people in his department out into the hallway (the meeting was being held in the HR training room) and proceeded to yell at them for having started the meeting without him being present.

The Complaining Witness described another meeting which involved an outside presenter who was trying to explain proposed changes to the Airports Authority's Ceridian System. The outside presenter left the meeting early because of Mr. Pritchard's intemperate remarks

---

[2] Mr. Pritchard often speaks of his role in the 2012 DOT-IG report and sees himself as a whistleblower. The Complaining Witness assisted Mr. Pritchard in obtaining information regarding Mr. Williams.

and stated that she had never been treated that way in her whole life. The Airports Authority manager in charge was able to prevail upon the presenter to finish the presentation to those still assembled.

After a particularly difficult meeting between the Complaining Witness and Mr. Pritchard regarding an executive compensation survey, she decided that she could no longer continue working with him and started looking within the Airports Authority for another job. At that point, she spoke to a number of other managers about possible employment opportunities. She also reported that Mr. Pritchard's conduct was not only affecting her emotionally, but physically as well. The Complaining Witness advised that her blood pressure was elevated, and that she was suffering from GERD and other intestinal issues as a result of her interaction with Mr. Pritchard. She further stated that it was becoming increasingly "painful" for her to deal with Mr. Pritchard as he was constantly emoting hate, making threatening statements, grunting, gesticulating, and making threatening faces by baring his teeth.

The Complaining Witness opines that Mr. Pritchard's conduct was purposeful and that he wanted to make his coworkers uncomfortable – that he tried to intimidate them. The Complaining Witness also reports that Mr. Pritchard does not seem to care about the propriety of his unprofessional demeanor.

The Complaining Witness advises that Mr. Pritchard threatened the Compensation group by instructing that they were not to help Mr. Vegliante or others, or they would be "off his team." The Complaining Witness reports that he did this on a number of occasions, and that she and others did their best to work around him.

The Complaining Witness reports that Mr. Pritchard would constantly gossip about others employed by the Airports Authority. For instance, Mr. Pritchard did not keep personnel decisions regarding people in the division confidential; specifically, the Complaining Witness was tasked with drafting a demotion letter for another Compensation Specialist. With respect to other managers at the Airports Authority, Mr. Pritchard always indicates his intense dislike for those who do not share his opinion and views about Airports Authority policy or HR initiatives.

As indicated above, the Complaining Witness reports that for the past year, as a result of working with Mr. Pritchard, her blood pressure has increased, she was diagnosed with GERD, she suffers from upset stomachs, gets tension headaches, and has been gaining weight. She described herself as an emotional and nervous wreck, and simply couldn't take it anymore which is why she complained about Mr. Pritchard to Labor and Employment Relations.

Witness No. 1

Witness No. 1 confirms that in the past year, Mr. Pritchard has become increasingly aggressive. He yells, he screams, he gesticulates, he rants about wrongdoing, and he essentially refuses to cooperate in programs with which he does not agree. Witness No. 1 describes Mr. Pritchard's opposition to the implementation of a PFP System, and refers specifically to a meeting which she attended where Mr. Pritchard was yelling, wagging his finger, and cursing. Witness No. 1 could not stay in the same room with him and simply left the meeting.

Witness No. 1 confirms the occurrence of an HR meeting that was held in the training room, where Mr. Pritchard arrived 10-15 minutes late. When he arrived, Mr. Pritchard took all of his staff into the hall and proceeded to castigate them, screaming that they should never go to a meeting without him. Since this meeting involved people outside of the HR Department, the meeting was adjourned for a short period of time and thereafter, Mr. Pritchard begrudgingly participated. Witness No. 1 also described a meeting where Mr. Pritchard was disruptive of the meeting presentation, by being aggressive and nasty, and mid-way through the meeting the presenter left and had to be convinced to return by the meeting organizer.

Witness No. 1 believes that Mr. Pritchard wants people to be afraid of him. He makes faces, grunts, and postures himself such that people will be intimidated. Witness No. 1 describes Mr. Pritchard as having a "gotcha" personality who loves to point out the faults and failures of his coworkers, especially the managers and vice presidents at the Airports Authority. Witness No. 1 reports that Mr. Pritchard generally arrives early in the morning, and regularly during the first half hour to hour of the day, yells and screams in what she describes as a very loud and boisterous tone.

Witness No. 1 also confirms that she had a discussion with the Complaining Witness about Mr. Pritchard's behavior and the effect it was having on her in July 2016. Witness No. 1 reports that Mr. Pritchard stares her and Complaining Witness down and has called the Complaining Witness out of meetings, telling her not to talk to other managers at the Airports Authority. Witness No. 1 reports that she was personally present when Mr. Pritchard instructed his staff not to talk to the "brain trust" or the "Postal Service people." Witness No. 1 reports that the Complaining Witness confided in her in the summer of 2016 that she had been tasked by Mr. Pritchard to investigate how the Chief Information Officer had won an award from an outside professional group.

Witness No. 1 also reports that Mr. Pritchard routinely uses the "F bomb" in the course of business. Mr. Pritchard has stated to Witness No. 1 on a number of occasions that he "doesn't give a f*ck what they think."



Witness No. 1 finds it offensive that Mr. Pritchard, a manager of the Airports Authority, routinely uses hand gestures and the middle finger, that he yells at people publicly, and that he has no sense of professional propriety. Witness No. 1 describes Mr. Pritchard's "two-finger gesticulation," which he uses when he disagrees with Mr. Potter or Mr. Vegliante, or anyone else in leadership.

Witness No. 1 reports that Mr. Pritchard has informed her that he intends to publish a "website which will air everybody's dirty laundry and embarrass the Airports Authority."

__Witness No. 2__

Witness No. 2 is a manager with the HR Department and reports that he has very little work which comes from Mr. Pritchard or involves him. He is well aware of Mr. Pritchard's disdain for the Airports Authority's executive management, and that he can be abrupt and gruff. Witness No. 2 advised that Mr. Pritchard's behavior has continued so long that everyone just seems to put up with him and that if anyone else behaved that way, the behavior would be considered shocking. Witness No. 2 further reports that Mr. Pritchard disagrees with most of the new HR initiatives and that if it isn't want he wants, he simply withdraws and disassociates himself and tries to be an irritant. Witness No. 2 could not confirm bullying or intimidating behavior towards others.

__Witness No. 3__

Witness No. 3 reports that as a manager in the HR Department, he routinely comes into contact with Mr. Pritchard. He finds Mr. Pritchard to be aloof and disrespectful. He believes that Mr. Pritchard thinks he is the only person who knows how to do anything right. Further, Mr. Pritchard has expressed his belief that no one is fully producing except him. He has vocally articulated that he believes senior management at the Airports Authority is going in the wrong direction.

Witness No. 3 confirms the incident that occurred when Ceridian representatives were invited to the Airports Authority to explain the new compensation module. Witness No. 3 reports that Mr. Pritchard was so disrespectful that the woman who was leading the discussion just got up and left. The woman had to be persuaded to come back. Witness No. 3 apologized to the woman for Mr. Pritchard's behavior.

Witness No. 3 describes Mr. Pritchard's attitude as an "us against them" world view. Witness No. 3 discusses an initiative regarding PE-10 forms and how Mr. Pritchard, who was opposed to the initiative, would either miss the meetings, send staff without authority to do things, or inform his staff to announce that only Mr. Pritchard could decide. When Mr. Pritchard is not in agreement, he simply does not cooperate or he walks out of meetings.

Witness No. 3 also confirms a meeting where Mr. Pritchard came late, pulled his whole team out of the meeting and started yelling at them loudly. Witness No. 3's opinion is that Mr. Pritchard was attempting to bully his staff.

Witness No. 3 confirms that the Complaining Witness has spoken to him on at least two occasions about the abuse from Mr. Pritchard. Witness No. 3 reports that Mr. Pritchard does not work cooperatively with any of his fellow managers, that he talks down to people, and that he is constantly checking up on others not in his group. Witness No. 3 advises that Mr. Pritchard routinely checks to see who has arrived at work on time.

Witness No. 3 also reports that he has, on many occasions, heard Mr. Pritchard refer to people as "idiots," "incompetents," as being "stupid," and doing things the "MWAA way" as a negative connotation. Witness No. 3 also reports that he has seen Mr. Pritchard ranting and stomping around the building so he can "cool off." Witness No. 3 says there is no one else in the Airports Authority workforce who talks or acts like Mr. Pritchard. When asked whether Mr. Pritchard subverts Airports Authority policies, Witness No. 3 reports that he does and gave two examples regarding the upgrading of job descriptions for Verdella Jennings and Tanisha Lewis. Witness No. 3 states that Mr. Pritchard simply did not want to upgrade those job descriptions and took almost a year to get it done.

**Witness No. 4**

Witness No. 4 does not directly work with Mr. Pritchard but confirms that Mr. Pritchard speaks very loudly, stomps around, and has a habit of slamming his door loudly. Witness No. 4 reports that everything with him is "over the top." Witness No. 4 could provide no information regarding how he treats his subordinate employees.

**Witness No. 5**

Witness No. 5 reports that Mr. Pritchard generally keeps to himself, but is very loud, and at times boisterous. Witness No. 5 advises that after all these years, he has simply adjusted to Mr. Pritchard's volume and his hyper or frenetic way of doing things. Witness No. 5 further advises that when she hears him raise his voice, she simply closes her door. She reports she has never seen him yell at any Airports Authority employees, nor has she seen him "go off" on any of his people.

Witness No. 5 describes Mr. Pritchard as being difficult and that he has a "gotcha attitude" wherein he likes to point out other peoples' mistakes or shortcomings. She describes him as a "know it all." Witness No. 5 reports that Mr. Pritchard criticizes other managers, often

refers to the "Postal Service people," and that he is always negative about management at the Airports Authority.

Witness No. 5 has no personal knowledge of any complaints by any Airports Authority employees regarding abuse or harassment. Witness No. 5 did report that she has heard Mr. Pritchard curse from time to time and that he is loud most of the time, but she could not confirm whether he was attempting to bully or intimidate other people. Witness No. 5 further reports that she puts up with him because everyone else does, including the managers.

Witness No. 5 further reports that Mr. Pritchard is very critical of changes that are going on at the Airports Authority, and is not positive about any of it. She has seen him gesticulate when he gets anxious and excited, and he never fails to voice his displeasure in meetings or in the hallways.

**Witness No. 6**

Witness No. 6 describes Mr. Pritchard as idiosyncratic and reports that everyone knows when he is around. Witness No. 6 further has observed Mr. Pritchard "bouncing off the walls" and that he has cursed in her presence. Witness No. 6 reports to work early and advises that when Mr. Pritchard arrives, he often "stomps around" – rarely does he say hello or interact with the witness. Witness No. 6 states that Mr. Pritchard uses a very loud voice which she would describe as "yelling." She does report that she has heard him yelling at his employees. The witness further reports that she has seen Mr. Pritchard "go off," but did not know whether he was "out of control." Witness No. 6 has heard Mr. Pritchard say things, which in her judgment, are rude. She has also heard him say things that are disrespectful towards people who do not agree with him. Witness No. 6 opines that Mr. Pritchard is certainly not acting as a professional manager in that regard.

**Witness No. 7**

Witness No. 7 claims that he has known Mr. Pritchard for quite some time, has heard conversations between Mr. Pritchard and his subordinates, and that those conversations have been loud. Witness No. 7 believes that Mr. Pritchard is probably frustrated and angry but does not know if he has directed that frustration and anger at his colleagues. Witness No. 7 further reports that he has heard Mr. Pritchard yell in the corridors. He does not know if he is attempting to intimidate anyone.



Witness No. 8

Witness No. 8 is a direct report to Mr. Pritchard. Witness No. 8's report of various meetings and events differs sharply from what had been previously reported by other witnesses. Witness No. 8 describes, for example, the incident with the Ceridian System presenter as "nothing unusual." The circumstance where the Compensation Group was taken out of a meeting was described as not unusual. Witness No. 8 did report that he has heard Mr. Pritchard talk about the "Postal Service gang" and he does think that Mr. Pritchard makes people feel defensive. With respect to Mr. Pritchard's relationship with the Complaining Witness, Witness No. 8 believes Pritchard has been intimidating towards her about not picking up on things. When asked whether Mr. Pritchard was disruptive, Witness No. 8 responded that he wasn't sure. He further reports that Mr. Pritchard makes things very personal and allows that might explain why people found him intimidating. When directly asked whether Pritchard had bullied him, he responded that while Pritchard had "pushed" him, he did not feel he had been bullied. Witness No. 8 states that Pritchard never referred to him as a "son-of-a-bitch" notwithstanding the Complaining Witness's specific reference to it. Witness No. 8 further reports that he had never been instructed by Mr. Pritchard not to talk to managers or vice presidents. This is in direct conflict with other testimony. When asked how Mr. Pritchard responds if he doesn't like decisions made by executive management, Witness No. 8 advises that he simply drags his feet and gave the example of job evaluations. He further states that Mr. Pritchard sets his own priorities and doesn't move things along with which he doesn't agree. Witness No. 8 further states that he hasn't spoken to Mr. Pritchard since November 29, 2016, which is contradicted in a statement given by Mr. Pritchard. While Witness No. 8 did answer questions, he was not particularly forthcoming. Although he attempts to paint a more rosy picture of Mr. Pritchard's behavior in the workplace, Witness No. 8 confirms that some of Pritchard's behavior could be intimidating or offensive to others.

Witness No. 9

Witness No. 9 is also a direct report to Mr. Pritchard and states that he has not observed Mr. Pritchard bullying or intimidating any of his coworkers nor has he heard Pritchard use offensive language or curse in the workplace. He further states that he has never seen Mr. Pritchard gesticulate in a rude or offensive manner. He does allow, however, that if Mr. Pritchard becomes upset or frustrated, he looks like his head will pop off, gets red, and looks very angry. Witness No. 9 is not supportive of the Vice President of Human Resources. Interestingly enough, Witness No. 9 advises that he was of the belief that the Vice President of Human Resources was incompetent and that he was not precise with respect to HR demands as they relate to "casual employees" or "non-career employees." Witness No. 9 claims not to have seen any offensive conduct by Mr. Pritchard but that Mr. Pritchard usually does the opposite of what management wants. Witness No. 9 claims that he has not had any contact with Mr. Pritchard since Mr. Pritchard was put on administrative leave.

Witness No. 10

Witness No. 10 is also a direct report to Mr. Pritchard. The interview commenced by my asking the witness to describe staff meetings. She reported they are not typical of staff meetings she had previously attended. She states that there was not much talk about current work, but rather the focus would be on the larger picture at the Airports Authority of which Mr. Pritchard was vocal and critical. Witness No. 10 advises that Mr. Pritchard would often describe positions and policies of management with which he disagreed. Witness No. 10 advises that Mr. Pritchard continually criticizes his manager, is very public about it, and is critical of other people employed by the Airports Authority. Witness No. 10 states that she is uncomfortable with Mr. Pritchard's behavior and reports that no one else at the Airports Authority behaves like he does. Witness No. 10 reports that Mr. Pritchard routinely speaks in a raised voice and that he routinely uses foul language. Witness No. 10 reports that she has, from time to time, advised Mr. Pritchard that his conduct is inappropriate, and then he will moderate his behavior for a little while thereafter. Mr. Pritchard has often told Witness No. 10 that he "hates these people" when he is referring to the "Postal Service gang" and the people he refers to as the "brain trust." Witness No. 10 feels very uncomfortable when Mr. Pritchard speaks this way but feels she has no choice but to listen to him. She reports that Mr. Pritchard is usually negative and rarely constructive. Witness No. 10 was asked directly whether she had seen Mr. Pritchard intimidate his subordinates and she states that she has not, but that her fellow employees had complained to her that people are afraid of him. Witness No. 10 relates that Mr. Pritchard has expressed dissatisfaction with respect to the work of one of the Compensation Specialists, and more recently with respect to the work of the Complaining Witness.

Witness No. 10 was asked whether Mr. Pritchard was disruptive in the workplace and she advises that he is. Witness No. 10 advises that Mr. Pritchard is disruptive by coming into the office suite, raising his voice, complaining loudly, using foul language, all in an apparent effort to direct attention towards himself. Witness No. 10 was asked whether Mr. Pritchard bullied her and she responded by saying that she wouldn't take it, but that others in the Compensation section will take the bullying. Witness No. 10 reports that when you push back on him, he stops his intimidating conduct.

Witness No. 10 further reports that Pritchard has no respect for either Tony Vegliante or Jack Potter. He thinks of them as "idiots" and "incompetents." He uses shorthand to denigrate others, such as the "brain trust" and the "Postal Service gang."

Mr. Pritchard has specifically told Witness No. 10 not to talk to Tony Vegliante. Witness No. 10 has heard Mr. Pritchard instruct his people not to talk to Mr. Vegliante or others in management. He has stated "we are not going to drop things that we are doing" and will simply miss deadlines that have been established by the Vice President. Witness No. 10 further advises that if Mr. Pritchard disagrees with the job description or promotion, he


simply will not sign that job description, which ultimately will be signed by Mr. Vegliante and not the Compensation Manager.

Mr. Pritchard has made no secret of his belief that there are too many positions in the IT Department and that they get paid too much money. He has become very oppositional with respect to IT and will not sign new job descriptions or anything else originating in the IT Department.

Witness No. 10 reports that two of the Compensation Specialists are required by Mr. Pritchard to send their work for review to this witness, who theoretically, is a better writer. Witness No. 10 also reports that she does Mr. Pritchard's work and that she feels uncomfortable doing that. She has done research on some of his pet projects which include his private submission to a board member relating to his Reservist/National Guard initiative. Witness No. 10 knew that both Mr. Vegliante and Mr. Potter did not approve the new initiatives with respect to National Guard or Reservist elements. Mr. Pritchard announced that he was doing it as a private citizen; however he did use Airports Authority resources to develop his proposals and present them to Board member Tony Griffin.

Mr. Pritchard has shared with Witness No. 10 that he not only dislikes the IT group, but feels that the new Office of Revenue is likewise "incompetent." Witness No. 10 also confirms Mr. Pritchard's statement that he is a "whistle-blower" and a "thorn in the side of the Airports Authority." He has also expressed his belief to her that his new bosses are no better than his old bosses.

Most interestingly, Witness No. 10 advises that Mr. Pritchard has been bullying and intimidating the Complaining Witness. She believes that since the Complaining Witness was promoted to a higher level, he is more demanding of her and from what she could tell, Mr. Pritchard was abusive and "tormented" the Complaining Witness for months during an executive pay project.

We spoke about Mr. Pritchard's gestures in the workplace which Witness No. 10 reports as being rude and unprofessional, but that he would from time to time catch himself when he was getting out of control. Witness No. 10 reports that she has shut Mr. Pritchard's door when she felt he was verbally out of control.

<u>**Witness No. 11**</u>

Witness No. 11 is also a direct report to Mr. Pritchard. Witness No. 11 describes Mr. Pritchard's demeanor as "lively," and that he is "passionate about his work." Witness No. 11 reports that Mr. Pritchard speaks in a loud voice, but she does not feel intimidated by him, nor has she observed him intimidating others in the workplace. When asked directly about comments made by Mr. Pritchard regarding Mr. Vegliante or Mr. Potter, Witness No.



11 responded that she really didn't speak to Mr. Pritchard that much and couldn't remember him being overly-critical of management. Witness No. 11 mostly responds that she does not recall whether she had ever discussed anything in particular with Mr. Pritchard. Witness No. 11 states that while Mr. Pritchard was not a warm and fuzzy supervisor, he ultimately was fair, and at times, accommodating. It was obvious to the investigator that this witness was uncomfortable and did not want to be involved in the investigative process.

**Witness No. 12**

Witness No. 12 is an HR professional who does not report to Mr. Pritchard. Witness No. 12 describes Mr. Pritchard as intemperate, characteristically loud, quick to criticize, and rarely cooperative. Witness No. 12 describes him as an obstructionist. Witness No. 12 reports that Mr. Pritchard is openly critical of Mr. Vegliante, and that from time to time, Mr. Pritchard comes into the witness's office to talk negatively about Mr. Vegliante, other managers in the HR Department and about Mr. Potter. Witness No. 12 feels this is demeaning, especially when he proclaims that they have no idea what they are doing and are idiots and incompetents.

Witness No. 12 states that Mr. Pritchard knows he is loud, but she describes his volume as excessive. His personal behavior is simply "inappropriate in the workplace."

Witness No. 12 describes Mr. Pritchard as angry and vehemently critical of people. She states that there is no one else at the Airports Authority who behaves the way he does. He speaks to people in a loud and angry voice, which in Witness No. 12's judgment, is intimidating. Witness No. 12 reports that Mr. Pritchard has tried to intimidate her but she simply won't permit it. The witness reports that she has been with Mr. Pritchard when there is animated discussion and he has gesticulated towards Jack Potter and Tony Vegliante, giving them both "the finger" in absentia.

The witness reports that Mr. Pritchard often says he is going to "get people," that he is going to "ruin people," and when he is finished, the Airports Authority will "come down" since nobody is doing anything right.

Witness No. 12 feels that Mr. Pritchard routinely "stirs the pot," and that he is not at all professional in that regard. The witness describes the Complaining Witness as professional, and not hypersensitive. The witness is aware of the Complaining Witness's report, and the same is accurate. Witness No. 12 also reports that she has heard Mr. Pritchard use the "F bomb" on a number of occasions, and that he has yelled out the same.



**Kenneth Pritchard**

Mr. Pritchard was interviewed on December 28, 2016. The investigator had the interview recorded and transcribed by a certified court reporter. Mr. Pritchard was represented by Richard R. Renner, Esq., a well-known employment attorney who took notes during the entire proceeding, notwithstanding the fact that a court reporter was present.

Mr. Pritchard was advised of his rights and signed the Notice of Administrative Investigation after the same was explained to him. Even though he answered questions, Mr. Pritchard was not particularly forthcoming, and quibbled about words and definitions. Mr. Pritchard occasionally raised his voice but mostly spoke in a conversational tone, notwithstanding his obvious anger at being subjected to the interview.

Mr. Pritchard has been employed by the Airports Authority for approximately twenty-eight (28) years. His annual evaluation shows that he has always been graded as fully successful, achieved or better. Evaluations done in the mid-1990's note that he easily became angry and frustrated which interfered with his ability to perform. Mr. Pritchard has over the years expressed his belief that the work of the Compensation Group is not valued and that he was purposely marginalized by management. Mr. Pritchard's disputes with the former Vice President, Arl Williams, resulted in his belief that he was a "whistleblower." The "whistleblower" narrative is a recurring theme throughout the interview process and document review. Mr. Pritchard assumes wrongdoing and violations of the law in many Airports Authority decisions. He complains to his staff about the alleged wrongdoing and in doing so, he denigrates Airports Authority management and exhibits an undue hostility towards many in the workplace.

Mr. Pritchard admitted that he has told people that he "hates" Tony Vegliante. He tried to soften that statement by saying that he "hated the behavior" of Mr. Vegliante, which he felt was contrary to things he holds dear in the law. When asked whether he has told anyone in the Compensation section that he was going to "get" Tony Vegliante, he stated that if he had said such a thing, he meant he was going to "get" Tony for his violation of federal law, Airports Authority policies, and generally accepted "merit principles." Mr. Pritchard has no concern for what impact a statement like that could have in the workplace and explains that the people in his workforce are aware of the situation. When asked about what situation he was referring to, he spoke about the "Airports Authority's continuing violation of the law, continuing violation of its own policies and procedures, and continuing violation of generally accepted merit principles," even though it "promised the DOT/OIG that it wouldn't do those things anymore."

When asked whether he ever made a statement that he was going to "get" Jack Potter, he denied remembering making any such statement, but said that if he did say it, it was because Mr. Potter had also violated federal law and Airports Authority policy.

MWAA-000000067



When questioned about his use of the term "Postal Service Gang" he referred to them as the "Postal Service People" and defined them as the ones who are leading the wrongdoing at the Airports Authority and the "wrongdoing" is the "violation of federal law, regulation, and executive orders having the full force and effect of law." When pressed with respect to which federal laws, policies, or procedures are being violated, he said "Title VII, the Rehab Act, and the Fair Labor Standards Act." When questioned further he could give no specific example, and knew of no one who had complained about the Airports Authority policies and procedures. He did report that some years back an individual named Dina Blocker-Johnson made a Fair Labor Standards Act complaint. Mr. Pritchard testifies that the key agents of the alleged wrongdoing and violations are Jack Potter and Tony Vegliante, and they do so through manipulation of qualification requirements and selection processes.

With respect to his statements regarding Mr. Vegliante and Mr. Potter, Mr. Pritchard was again asked whether he had ever considered the effect that such statements might have on people working at the Airports Authority. He first responded by saying that he had no idea how it might affect them. When pressed further, he felt it would have no effect on them. Mr. Pritchard admits he might have made these negative statements regarding Mr. Potter and Mr. Vegliante to persons outside the Compensation Group.

When asked whether any of his direct reports ever asked him to calm down, he admitted that it might have happened. He admitted his direct reports may have told him he was out of control. He claims he almost never uses profanity in the workplace, has never slammed doors intentionally, or has yelled or screamed in the workplace.

Mr. Pritchard denies cursing at anyone who works for him. He denies he uses hand gestures or has gesticulated vulgarly in the workplace. He admits that he has lost his temper in the workplace but couldn't report when.

With respect to his yelling and screaming, Mr. Pritchard states that he speaks in a loud and clear voice as a matter of course. He claims that he has never told any of his direct reports that they would be "off his team" if they cooperated with Tony Vegliante. He claims never to have used the term "off my team."

With respect to instructions given his subordinates regarding speaking with Tony Vegliante, Margaret McKeough, or Jack Potter, he concedes that he might have told them not to speak to them in specific instances having to do with the fact that he is the manager and wanted to handle matters himself.

Mr. Prichard carefully parsed his words with respect to yelling in the workplace. He initially testified that he did not think yelling was disruptive in the workplace because it depended on the situation. After some discussion, Mr. Pritchard finally responded that it would be inappropriate if someone was screaming, not yelling, with the purpose of denigrating someone else in the workplace.

Again, after something of a discussion, Mr. Pritchard finally agreed that the use of vulgar gestures in the workforce would be inappropriate since he could offer no set of circumstances as to when it would be appropriate. A similar discussion was had with respect to curse words and other vulgar and profane language. Mr. Pritchard thought that such usage was not necessarily offensive.

Mr. Pritchard was asked whether he maintains files on Airports Authority Vice Presidents and others, and whether he regularly transfers Airports Authority files to his private computer. He reports that he has files on Airports Authority employees. He claims the only reason he transfers files to his private computer is so that he can work at home. Mr. Pritchard has no recollection of the meetings regarding a representative from the Ceridian System, or the meeting where he ordered his Compensation Group out so he could lecture them about going to meetings without him.

Mr. Pritchard defined the "brain trust" as "Pulcrano, Lewis, and Vegliante." While discussing Mr. Pritchard's gathering of information, he mentioned his "fiduciary responsibility to check on compensation packages and make sure that we don't have discriminatory practices." Mr. Pritchard claims that he has supported initiatives within the past year. He claims to have saved, or at least implemented, the PFP System which is currently in place.

With respect to producing job descriptions for Verdella Jenkins and Tanisha Lewis, Mr. Pritchard indicated that they took a long time to complete because he had other priorities.

I spoke at some length with Mr. Pritchard regarding his enlisting Airports Authority employees to help him with his private work. He claims never to have done that. When I asked him about his initiative regarding the National Guard and Reservists, he admitted that he first presented it to Mr. Vegliante and then to Mr. Potter, both of whom advised him there was not going to be an Airports Authority initiative. He, thereafter, stated that he took it forward to co-chair of the Human Resources Committee, Mr. Griffin. He admitted that he had some of his direct reports work on the initiative prior to the time that he presented it to Mr. Griffin.

With respect to assigning work to the Complaining Witness, to prepare papers that demoted another Compensation Specialist, Mr. Pritchard stated that he would not have given any work to any of his employees that he felt was inappropriate.

Mr. Pritchard admits that the Complaining Witness has asked him to calm down and that Witness No. 10 has told him to calm down, but that none of them have ever told him to stop yelling, stop shouting, or stop cursing, at least "not in those words." He claims that no one else has ever asked him to "calm down."

Finally, Mr. Pritchard admits that sometime in 2016, the Complaining Witness told him that she was uncomfortable with his loud voice and that she was getting sick.

**Findings**

The evidence obtained during this investigation demonstrates that Mr. Pritchard has been angry and frustrated with the Airports Authority for many years. That anger has in recent times been directed more and more to his direct reports and fellow managers. His hatred and disdain for executive management at the Airports Authority is repeatedly articulated.

While there are at least two of Mr. Pritchard's direct reports that do not find his behavior objectionable, in some respects they confirm it has occurred. Mr. Pritchard's behavior toward the Complaining Witness has, however, been corroborated by others and partially confirmed by Mr. Pritchard.

Mr. Pritchard's insolence, aggressive and intemperate behavior has negatively affected the workforce and the unit which he supervises, the HR Department at large, and the larger Airports Authority institution.

Mr. Pritchard's behavior has adversely affected the Complaining Witness as corroborated by another direct report. The Complaining Witness has reported emotional distress as well as physical distress all as a result of Mr. Pritchard's intemperance and hostility. Mr. Pritchard's behavior has adversely affected others in the HR Department, who not only object to his rants, but actively avoid him because he has made it difficult for them to work with him. Mr. Pritchard's insolence and disparagement of his mangers and the executive leadership adversely affects the institution for which he works. As a result of this anger and hatred, Mr. Pritchard has created a workplace atmosphere that can be described as hostile. Lastly, Mr. Pritchard has abused his position as a Manager of the Airports Authority. He has asked his subordinates to check up on other Airports Authority employees, specifically what time they arrived at work and where and for how long they parked their cars. Moreover, Mr. Pritchard continued an initiative regarding Reservists and National Guard members when he was told by his Manager that the Airports Authority would not go forward with such an initiative. He continued to work on the initiative as a "private citizen," continued to develop the same using Airports Authority resources and presented the initiative to a board member. In doing so, Mr. Pritchard abused the office entrusted to him by clearly disregarding a policy decision that had been dictated by his managers. Mr. Pritchard's behavior in this regard clearly shows his disdain for his employer. As such, this investigator finds as follows:

1. Mr. Pritchard has behaved in ways that are offensive to his coworkers and others by yelling, screaming, grunting, gesticulating, slamming doors, and making

threatening faces all in violation of Section 2.3(a)(1) of the Conduct and Discipline Directive;

2. Mr. Pritchard has repeatedly used profane language in the workplace and has employed obscene gestures in violation of Section 2.3(a)(10) of the Conduct and Discipline Directive;

3. Mr. Pritchard has attempted to bully and intimidate his direct reports by instructing them not to speak to the Vice President of Human Resources and others, and by being intemperate with, and yelling at them, in violation of Section 2.3(a)(11) of the Conduct and Discipline Directive;

4. Mr. Pritchard's repeated reference to the President and Vice President of the Airports Authority as "idiots and incompetents," constitutes such insolence that he is in violation of Section 2.3(a)(8) of the Conduct and Discipline Directive;

5. Mr. Pritchard's employment of his subordinates to report on other Airports Authority employees and his continued use of Airports Authority resources including the recruitment of Airports Authority employees to assist him in his private submission of an HR initiative that was not sponsored by the Airports Authority is a fundamental abuse of his duty of loyalty and his position as a manager; and

6. Mr. Pritchard's behavior toward the Complaining Witness is also a violation of the Workplace Violence Directive since the Complaining Witness informed Mr. Pritchard that his conduct was making her sick, and Mr. Pritchard failed to moderate his objectionable conduct.

Given the combined findings set forth in Paragraphs 1 through 6 above, it is clear that there has been a gross violation of the Conduct and Discipline Directive and the Workplace Violence Directive.

Based upon the foregoing, the complaint that Mr. Pritchard violated the Conduct and Discipline Directive is sustained.

Sincerely yours,

FRIEDLANDER MISLER, PLLC

By: ______________________
Morris Kletzkin

MK:fm