## DECLARATION OF KENNETH H. PRITCHARD

I, **Kenneth H. Pritchard**, under penalties of perjury declare that the following is true and correct according to my personal knowledge:

1. I am over eighteen years of age.
2. I am making this declaration to provide information that might be helpful to the Court in deciding motions in the Case of Kenneth Pritchard v. Metropolitan Washington Airports Authority (MWAA).
3. This declaration presents facts known to me through my personal knowledge.
4. I was employed by MWAA from February 14, 1988, to February 7, 2017. I was most recently the Manager of MWAA's Compensation Department.
5. I made disclosures about my concerns of illegality, waste and gross mismanagement both within and outside the MWAA chain of command. I made such disclosures in each of the years from 2010 through 2016. These disclosures included meeting with MWAA Board member Tony Griffin on 10-19-16 (Mr. Potter intruded upon my meeting, caused me to stop presenting and angrily walked out of my meeting); meeting with Congressman Frank Wolf on 3-29-11, meeting initially with FBI Special Agent Angela Ryan and DOT-OIG Criminal Investigator Dennis Ocampo in April 2011: and working with DOT-OIG and conferring with the FBI from 2011 through 04-10-14. I disclosed to them various and recurring MWAA violations of Federal employment laws, including Title VII, violations of the Lease between MWAA and DOT, and violations of the terms and conditions of Federal grants-agreements that applied to the Rail Project and involved Federal grant money (including ARRA money). I also told all of these parties about acts of retaliation against me for the protected disclosures I made.

6. In 2012, I told Potter, face-to-face and in writing, that he, COO McKeough and General Counsel Sunderland had retaliated against me. I told Potter in April 2013, by email, that he was retaliating against me by making me stay in the office I had been forced to move into, away from my staff, in July 2012, and he responded that he had fully supported this forced move then, but it had not been retaliation on his part, and that he was willing to allow me to return to my former office with my staff.

7. In 2012, I told General Counsel Sunderland, face-to-face and in writing, that he had retaliated against me by using Reisig, whom I had named as a retaliator against me, as liaison for his investigation of complaints by me (and others). MWAA finally launched its own investigation of wrongdoing in late April 2012, a full ten months after DOT-OIG began its management audit of MWAA.

8. In January 2010, I gave a one-page, non-specific written statement to CEO Bennett about wrongdoing by VP for HR Williams, Employment Manager Lockhart and Benefits Manager Reisig about retaliation against me for pushing back against their wrongdoing in 2009. This was part of my appeal of my performance evaluation for 2009. In a later meeting (February 2010), Bennet told me to provide more detail about my entire appeal.

9. On 4-30-10, as part of my broad-scope performance evaluation appeal, I gave a written statement to CEO Bennett about retaliation against me by VP for HR Williams and Employment Manager Lockhart because I opposed the special favors he had done, and interventions he made in creating jobs, selecting people and setting their pay rates. (This statement is in Plaintiff's Exhibit #15.)

10. Years before, I thought it was "just" cronyism when Williams' hired friends and relatives, those of Board Chair Crawford, those of Board Member Manning, those of VP/Board

Secretary Brinkley, those of Board Chair Reiley, those of Employment Manager Lockhart, those of various other managers at MWAA and, thus, only a contravention of the MWAA Code of Ethics, generally-accepted merit principles in the public sector, good public policy, the public trust, etc.  I and my staffer Jennifer Howard had tracked these contraventions for well over five years and I had pushed back against them, incident-by-incident, directly with Williams.  By the latter part of 2009, I had become convinced it was preferential treatment on the basis of race and I shared this conclusion (and the facts supporting it) with Howard.  In addition, as Administrator of the Exit Interview Program (EIP) and through my staffer Gail Endicott (who then managed the EIP day-to-day), I had received employee complaints about various acts of mismanagement and wrongdoing by Lockhart, Reisig and Williams.  The complainants with the most serious allegations were HR Technician Yanique Ingarra and HR Technician Cassandra McNeil. Through the EIP, they reported to Gail and me allegations of contraventions of MWAA programs, policies and procedures ($P^3$) and Federal employment law.

11. On 5-27-10, I (with Endicott and Acting VP for HR Mike Brogan) presented Acting CEO E. Lynn Hampton and COO McKeough with an EIP report highlighting allegations by employees exiting the Office of Human Resources of wrongdoing by Williams, Lockhart and Reisig.  Allegations included (1) improper (a) hiring of and (b) time reporting (timecard fraud) for, family members and friends, by both Lockhart and Williams (Ingarra), (2) abuse of health benefit plan rules by Lockhart to cover an ineligible person (a relative who was not under her guardianship) as permitted by Benefits Manager Reisig (per Ingarra as supported verbally by Pritchard/Endicott per Endicott's discussion with Marcelene Wesley who worked under Reisig the Benefits and Retirement Department), (3) "disparate treatment" (per

McNeil) and (4) a "hostile work environment" plus refusal by Williams to investigate complaints brought to him. One of the complainants (Yanique Ingarra) had already submitted some of these allegations anonymously to top management (McKeough). In this meeting, I also reported a violation in 2009 of the Pregnancy Act reported through the EIP.

12. On 6-22-10, I presented information to McKeough she had requested in response to some non-EIP complaints I had presented to her in May 2010 concerning the misuse of Unclassified Duties (UD) as vehicles to give favored employees temporary pay increases; these "UD/DwP" actions contravened official pay policy made by CEO (then-COO) Bennett on 12-2-97. This entire package was all about contravention of (1) MWAA staffing, pay and benefits programs and policies, (2) MWAA nepotism prohibitions and (3) possible Title VII violations by Williams and his agents that I had detected through a specific pattern of UD/DwP contraventions. (See the entry for 10-13-10 regarding this pattern that likely violated Title VII.) By email of 6-28-10 at 1413, subject: "Spreadsheet on detail assignments", McKeough told me to reformat and "reprint this chart" (dated 6-22-10) for easier reading by her of content and my recommendations. I ended up giving her one refinement after another including a "sanitized" version she could present to Williams that would not immediately cause him to "know" that I was the source; however, McKeough explicitly outed me to Williams anyway on 8-6-10 (if not before then).

13. On 6-24-10, after re-verifying all information presented 5-27-10, I presented a written report to Hampton and McKeough with the same allegations reported 5-27-10. I gave both of them the supporting EIP documents as part of this package.

14. On 7-1-10, in response to a directive by McKeough of 6-28-10, I gave her an updated and reformatted version of the Unclassified Duties and Details with Pay (DWP) Report covering

4

23 employees. I also gave a copy to Brogan who was still serving as Acting VP for HR.

15. On 7-15-10, I met with McKeough and then had Endicott deliver (on 7-16-10) to secretary Alesia Javins for McKeough (and to Acting VP Brogan) a typed 2-page note. This note documented several things including my allegation that "$500,000±" over "4± years" has been wasted by VP Williams on a "family friend … and another contractor …" I knew this to be true from several discussions with Brogan, my own tracking of work within the Office of Human Resources and my review of copies of invoices I had gotten from sources in this Office and the Procurement and Contracts Department. I had been tracking this fraud-waste-abuse for a long time. I first reported it to CEO Bennett in April 2008 – a spreadsheet that cites "padding" in professional service and temporary service contracts among other problems. Reference Plaintiff's Exhibit #98.

16. On August 3-5, 2010, I continued working with McKeough. She told me she sent at least one email to Williams about allegations against him. I told her of my fear of retaliation by Williams.

17. On 8-6-10, McKeough held a meeting with Williams, Brogan and me. In the meeting, she urged Williams to be more careful about his use of DwPs (which I had roundly criticized as improper, if not illegal, to both Hampton and McKeough). She clearly identified me as (a) the source of the complaints against Williams and Lockhart for their wrongdoing and (b) the detailed data she had received about it. Williams was from then on extremely angry with me. He ended a temporary pay increase for me and retaliated against me in other ways and then began another series acts of retaliation in August 2010, including cancellation of training that Brogan had approved for me while serving as Acting VP for HR; retaliation continued through the end of 2010. In the afternoon of 8-6-10, I visited McKeough and told her that

retaliation I had expected had begun. Lockhart was also upset at me from then on and took her own acts of retaliation against me in addition to serving as an agent of Williams in his retaliation against me.

18. On 10-13-10, I met with Sunderland and Employment Attorney Kalet and discussed wrongdoing by Williams and Lockhart in HR and contracting. I stated that 5 of 7 employees receiving special pay or benefits are Black, *and* thus, based on the percentage (71%), which does not reflect the workforce proportionately, there is an apparent violation of Title VII through preferential treatment. I reported more and we discussed more. I asked Sunderland at the table (a) if MWAA believed I was a "whistleblower" and, if so, (b) "what protections are afforded"? I gave them a 3-ring binder of supporting information; it included the spreadsheet indicating preferential treatment based on race (the 5-of-7 fact).

19. On 1-31-11, I reminded Sunderland in writing about the 10-13-10 meeting (of Pritchard-Sunderland-Kalet) and asked Sunderland for his answers about (a) whistleblower status of me and (b) protections afforded me.

20. On 2-7-11, Sunderland responded with a memo to me that I was a "whistle blower" under MWAA policy for coming forward with allegations of "fraud, waste or misuse of Authority property" but denied that allegations by me were covered by Federal law and stated, therefore, I was not protected from retaliation under Federal law. See Plaintiff's Exhibit #19.

21. In slide 3 of my 3-29-11 PowerPoint (PPT) presentation to Congressman Wolf, I talked about the Rail Project – unallowable costs, unsubstantiated costs and cost over-runs. Fred Seitz and Dennis Dayton had provided me with information about these matters. (Plaintiff's Exhibit #99 (3-29-11 PPT with presenter's text.) DOT-OIG's audit of Phase 1 of the Rail Project validated the information I gave to Wolf and then to the DOT-OIG management auditors.

6

The same is true of what I said about "sole sourcing" (slide 4 of my PPT). The first audit report by DOT-OIG (published 11-1-12) addressed this type of violation of the Lease and related violations of the Lease in non-Rail Project contracting.

22. The concerns raised in slides 5 and 6 of my presentation to Wolf mainly sprang from the research and hands-on work Jennifer Howard and I did in the Office of Human Resources from about 2003 through 2011.

23. From approximately March 29, 2011 to April 10, 2014, I worked with numerous DOT-OIG management auditors, FBI Special Agent Angela Ryan, and DOT-OIG Criminal Investigator Dennis Ocampo, then Criminal Investigator Lonnie Robinson, as well as higher echelon auditors and investigators, and gave them information for their audits and investigations of misconduct (civil and criminal) by MWAA officials. As one example, I disclosed how MWAA's General Counsel Sunderland had a laissez-faire attitude which helped empower employees such as Mr. Williams to continue in their illegality and abuse of power for personal gain. As another, I gave information about theft of personal property. I also gave information and referrals about kickbacks and waste in contracting and Rail Project abuses.

24. Plaintiff's Exhibits 94, 100 and 117 are examples of my disclosures to DOT-OIG management auditors and criminal investigators.

25. I helped DOT-OIG and MWAA locate and understand the kickbacks in contracting to Williams and Lockhart. Tanisha Lewis provided information that helped on these matters. She provided information to MWAA attorney Kalet about payments to William's wife; Kalet was reviewing these files.

26. Attached to my opposition to MWAA's motion for summary judgment, I have attached excerpts of reports from the U.S. Department of Transportation's Office of Inspector General

(OIG, or DOT-OIG). These reports include OIG Report No. AV-2013-006 (November 1, 2012), OIG Report No. ZA-2014-021 (January 16, 2014), OIG Report No. ZA-2015-035 (March 20, 2015). These excerpts are from reports on the OIG's public web page and they are genuine and authentic.

27. On 6-3-11, I met with Sunderland. My visit was mainly to tell him about Sharon Breighner's exit interview 6-3-11 in which she alleged (1) violation of the FMLA in her own case (a Federal law violation) and (2) various improprieties in the employment function in a number of instances, all by Lockhart (the MWAA Employment Manager). In addition, I summarized the key content of (3) my meeting with Sunderland and Kalet of 10-13-10 and (4) my meeting with McKeough and Hampton of 5-27-10 and the follow-up written report. Sunderland told me to see Kalet (who was out) upon his return about items (1) and (2).

28. On 8-9-11, I telephoned Kalet and left him a voicemail telling him that I feared MWAA was not telling EEOC the truth about the Andrea Bickley case in its official reply to EEOC. I had concluded this by talking with EEO Officer Julius Evans and with Andrea Bickley in detail and then reviewing official HR records. I told Kalet by voicemail why I had concluded that MWAA was not telling EEOC the whole truth. I later spoke with Kalet on the phone and exchanged email with Kalet about this matter. I named Williams and Lockhart as liars in this case based on my discussion with Evans, my discussions with Bickley and my review of records.

29. On 9-27-11, I (with Endicott present) presented McKeough with EIP summary information for the period 7-1-08 to 8-31-12. One PPT slide showed, and I and Endicott confirmed with details, that several exiting employees in the Office of Human Resources had cited wrongdoing by Deborah Lockhart on her own and as a key agent of VP Williams in his own

8

wrongdoing. The list of allegations presented against Lockhart that were made by exiting HR employees (mainly her own staff) include violation of merit staffing processes, "denial of rights under the FMLA" (per Breighner), "harassment" (per Breighner), "retaliation" (per Breighner) and "a hostile work environment" (per McNeil and Breighner). Endicott and I had received this information from them and I verified it. This is the same group of 4 employees (including Ingarra and McNeil) and their allegations discussed with McKeough, and Interim CEO Hampton, face-to-face, on 5-27-10. I had also documented them in writing in the written report to her, and Interim CEO Hampton on 6-24-10. Reports by these 4 employees together with reports by Lisa Robinson, Pat Steven and Sharon Breighner who exited in 2011 came to 7 employees total (in a small unit). The key PPT slide shows that all 7 of these exits included sufficiently adverse input from the employees to be "Escalated to Legal" (one-by-one as they occurred) and that these 7 accounted for 70 percent of all exits "Escalated to Legal" (MWAA-wide) consistent with Program guidelines. Another slide showed that total exits eligible for EIP under this period were ±200. The meeting focus was the allegations against Lockhart, alone and in concert with Williams, but I stated that Reisig was clearly implicated in a health benefits coverage violation. McKeough asked me for a formal, written and detailed report in two copies for CEO Potter and herself concerning the allegations made by the employees of Lockhart and Williams.

30. On 10-12-11, I presented the two copies (one for McKeough and one for Potter) of the Special Report of EIP summary information (dated 10-11-11) about wrongdoing in the Office of Human Resources requested by COO McKeough – formal, written and detailed, and reporting what exiting HR employees had said, I had verified and I had packaged (with help by Endicott). Examples are contained in Plaintiff's Exhibit #43.

31. I made numerous protected disclosures in 2012 to Potter, Sunderland, Kalet and Henry Morris of Arent Fox, a law firm hired by Sunderland. In CEO Potter's testimony before Congress in November 2012, he did admit to some of his own improprieties in the hiring of former Board Member Reiley though not his role in creating a job just for her and the lavish compensation package, including severance, he gave her. I made numerous and diverse protected disclosures within MWAA (to key officials – Vegliante, Sunderland and Potter in 2013, 2014, 2015 and 2016 as well. In 2016, I made key disclosures to Board Member Tony Griffin.

32. I presented PowerPoint (PPT) shows and other documents to CEO Potter and General Counsel Sunderland and MWAA legal staff, clearly showing I was a whistleblower within MWAA. I made continuing and diverse disclosures about violations by MWAA of Title VII, the FLSA, the IRCA (forms I-9) and other Federal requirements, violations in contracting (covered by MWAA's Lease with DOT) and contraventions of its own programs, policies and procedures. My disclosures covered violations made 2010 (and before) through 2016. Those violations from the second half (July) of 2011 through 2016 were during the tenure of Potter. Those from the second half (June) of 2013 through 2016 were during the tenure of VP for HR Vegliante. All disclosures I made from 2010 through 2016 were entirely within the tenure of Sunderland and McKeough. As stated, Sunderland issued me a memo in 2011 telling me that I was in fact a "whistle blower" under MWAA policy (Plaintiff's Exhibit #19).

33. MWAA did not terminate Potter, Vegliante, Sunderland, Lockhart, Reisig or VP Steve Baker.

34. On 04-01-13, I told Mr. Potter that I was experiencing continuing retaliation.

35. On 6-15-2012, I heard VP for Public Safety Elmer Tippett tell Sunderland and then McKeough that he had found Williams and Lockhart culpable of improper use of a contract by "name requesting" people. He let me listen to these telephone conversations. On the phone, he referred to Williams, Lockhart and perhaps others as a "group of vipers."

36. Neither Potter, nor Vegliante listed any abusive or harassing behavior in my performance appraisals signed by them in 2012, 2013, 2014 or 2015 and there is no labor-employee relations record of any discipline against me for any bad behavior. Potter, but not Vegliante, signed my 2012 appraisal. Both of them signed my appraisals in 2013-15.

37. Vegliante did not counsel me in 2013 or any time since for "yelling" at Deborah Lockhart. He never once counselled me about bad behavior, including in 2015 or 2016 when my behavior is alleged to have devolved.

38. In 2014, I met with Vegliante on multiple occasions to reassert my dismay and disgust that Lockhart, despite her known Title VII violations in staffing, remained in charge of recruitment-selection-placement MWAA-wide, and, despite her known timecard violations, remained in charge of timecards MWAA-wide. In one incident, I spoke (3-13-14) to Vegliante about Vegliante and Potter keeping "known" untrustworthy employees in their positions of trust and stewardship.

39. Vegliante told (5-12-14) me that the Fire and Rescue Department is "male, pale, and stale" and that too many current firefighters came from (or resided in) West Virginia. I was dismayed by the male-pale-stale comment and reference to West Virginia people, told Vegliante so, and pushed back against the cost of Rookie Firefighters amid abundant supply of fully qualified firefighters who did not need Rookie training. Immediately after that meeting, I read Janice Borneman-Eckels (Labor Relations Specialist) my notes about

11

Vegliante's West Virginia and "male, pale, and stale" comments. This so-called "diversity" initiative later resulted in actual Title VII violations – preferential hiring of Blacks with adverse impact on Whites (> 80% Black), in context of the applications received, the recruitment process, and selection pressures placed on Employment Specialist McCray and key Fire and Rescue Department managers by Vegliante, etc.

40. Vegliante directed (January-December 2014) outside-the-system job grading treatment for several jobs/people, including: (1) initial grades for new jobs, (2) upgrade of, or no-change-to actions for, existing jobs, and (3) refusal to permit review and downgrade of existing jobs that had lost critical job content value. In one act of retaliation concerning job grading, Vegliante (for several weeks) withheld information about a key reorganization (with job design-grading issues) from me. However, a Compensation staff member learned of it (the Corporate Risk and Strategy reorganization initiative), albeit accidently, and told me; it seemed that Vegliante had shared news of it with, and assigned initial job design/grading advice work to, a non-Compensation staff member. In another act of retaliation involving my job evaluation function, Vegliante informed me that he had assigned Rookie Firefighter job description work to non-Compensation staff member Lisa McCray (Employment Specialist).

41. Vegliante assigned (in or around fall-winter 2014) Police-Fire FLSA work to non-Compensation staff member Robin Wade; in addition, Vegliante kept me in-the-dark about the issues and this tasking in my functional area and thus denied me key pay-based and key customer service-based information, all within my assigned functional domains. Directed pay treatment by Potter and Vegliante strongly encompassed, but was not limited to, cases of preferential or disparate treatment on account of race or sex.

42. In the HR Managers Meeting of 1-18-15, I pushed back against MWAA attorney Bruce

Heppen (mainly) and select HR staff (including Vegliante) about Bona Fide Occupational Qualifications (BFOQs), job content, and MWAA's changing certification requirements for procurement personnel, which I asserted betrayed the first certification requirement that some employees could not pass. Later, at least one employee (Black Female) was terminated for failing to obtain this certification, which I asserted was contrary to Federal legal standards because it was not job-related (per my job content analysis) and not consistent with business necessity. The subject procurement staff certification requirements at and by MWAA changed several times during 2014 and 2015. MWAA established requirements in response to the 11-1-12 DOT-OIG report and discussions with DOT, but both Federal agencies relied on MWAA to establish legal and otherwise appropriate requirements. In addition, in several one-on-one meetings in 2014 and 2015, I also discussed this matter with, and made my legal concerns known to, others, including Lewis who was Vegliante's point person on this certification matter. (Pete Delate of the Compensation Department worked closely with Lewis on this matter in 2014 and 2015, keeping me well-informed.)

43. I pushed back (January-December 2015) against contravention of promises to DOT-OIG and DOT (Lessor) by MWAA to follow its own programs and systems faithfully (and to be transparent) and violations of Title VII in job grading – preferential treatment and disparate treatment. I pushed back (January-December 2015) on a case-by-case basis against Vegliante when he (1) directed, on a case-by-case basis, special/favorable outside-the-system job grading. For example: (a) a new executive-level job (3-24-15) under Executive Vice President (EVP) Jerome Davis (Black Male) – this job was eventually titled DVP, Diversity Supply (also discussed in 2016 Summary in Attachment 2 to our rebuttal to EEOC in July 2018), (b) two other new, high-grade jobs (3-24-15) under EVP Davis, and (c) selected

13

secretary jobs (August-September 2015). I also pushed back when Vegliante (2) refused to allow my staff and me to address known job grading inequities that favored individuals (e.g., ignoring significant and well-known diminution in job content that strongly indicated a lower grade). Like the three directed-from-above special grading treatment cases noted in (1)(a) and (1)(b) above, Vegliante's actions were linked to race. For example: (2)(a) VP/DVP, Business/Customer Service (Steve Baker, Black Male) and (2)(b) Budget Officer (Rita Alston, Black Female). I pointed out to Vegliante that MWAA, contrary to this preferential (do-not-downgrade) treatment of Baker and Alston, had identified for downgrade and downgraded or abolished jobs (even under Vegliante) encumbered solely, or mainly, by Whites, including Firefighter Technicians and Assistant Fire Marshals, and followed policy on retained grades that apply in such cases. In both (1) and (2) above, covering grading of new and existing jobs, respectively, Vegliante, on a case-by-case basis, cited Potter or "the Board" as having directed the special (inequitable-preferential) treatment. I asked Vegliante for something in writing that stated it was "the Board" that directed favorable job grading for the three new positions, (1)(a) and (1)(b), under EVP Davis. Vegliante did not respond and did not give me anything in writing about these positions. My pushback included citation of violation of Title VII and contravention of promises made to DOT-OIG and DOT to end special, outside-the-system treatment of employees.

44. Vegliante assigned (in or around November/December 2015 continuing into March 2016) critical Compensation work about a Living Wage Initiative to non-Compensation staff, thereby diminishing my compensation program manager role. He left me in-the-dark about this assignment as well as the issue itself, which was a high-profile Board issue that made all the papers in 2016. I learned of this issue and assignment only in March 2016, when the

Compensation work was assigned to me (now with a short deadline) by Vegliante.

45. Vegliante diminished my role as MWAA's job evaluation and pay policy advisor. In one incident, Vegliante sought (10-29-15) and obtained grade and pay policy advice from HRIS Manager Lewis (even though she had no job evaluation or compensation expertise). I was so shocked by this that I had to leave work early at noon (though after eight hours of work).

46. Vegliante did not tell (December 2015 and into January 2016) me that HR-015, Compensation (the new Compensation policy directive I drafted) had been approved by Potter on 12-9-15 and had gone into effect. I did not discover its effective date until January 2016 (when I received printed copies at the same time they were issued MWAA-wide) even though I was the program administrator.

47. Vegliante and McKeough excluded (December 2015 onward) me and my staff member Nancy Robinson from the plethora of job recognition and cash awards given to others at MWAA for work in licensing Transportation Network Companies (TNCs) and implementing the "operational structure" to control them.

48. On or about 11-18-16, I disclosed to Associate General Counsel Bruce Heppen that, *inter alia*, potential ongoing threat to the life and safety of federal law enforcement officers, MWAA law enforcement personnel and the public at both airports, based on an Exit Interview from a former MWAA police officer about untimely checks of wants-warrants-etc. by MWAA's public safety dispatch center. Mr. Heppen quickly denied any problems and copied Vegliante and Sunderland. Mr. Heppen notified me that I was on administrative leave on 11-29-16.

49. I did not use intimidating faces or grunting while I worked for MWAA. While working at MWAA, I rarely used profanity, and when I did, I used profanity that was less profane than

15

that used by Vegliante. The regular use of "strong" profanity by Vegliante even in Managers Meetings led me to believe that profanity was permitted in his unit if not also MWAA-wide. Vegliante regularly used profanity in group meetings with other MWAA managers. I used the middle finger on one single occasion over the course of my career at MWAA and, in this instance, I did not use it "to" insult any individual. I do not have a habit of using the middle finger. However, "giving somebody the finger" also appeared to be permissible at least by my supervisor, VP for HR Vegliante, because he took no action at all when Gerald Mayfield and his supervisor (Frank Wojnar) reported to him that VP for Audit Lee Wyckoff had "given the finger to" Mayfield publicly in the MWAA parking lot. (Mayfield and Wojnar work for Vegliante.) Similarly, Sunderland is said by many to berated and blasphemed at Melissa Waller on a recurring basis. Waller was a subordinate of Sunderland and she eventually came to Vegliante (and Wade) about this abuse, but no action was taken against Sunderland. I learned his abuse of Waller from Joe Kalet in years past and when she finally came forward to Vegliante and Wade she told me about it herself.

50. I did not threaten to "get them", referring to Potter and Vegliante; instead I told some members of my staff that I would report them to DOT-OIG "soon" – 2017 (just as I had reported them in 2012 and 2013). I did not scream in a department meeting that I "hate these people."

51. When I asked my staff not to discuss an issue with Mr. Vegliante, I did so in the context of directions to have them tell Mr. Vegliante to discuss the matter directly with me. My directions were meant to have direct communications between Mr. Vegliante and myself, and not to prevent my staff from initiating their own communications with Mr. Vegliante if they wanted to. Indeed, my staff regularly reported to me about their work and communications

16

with Mr. Vegliante; they worked directly with him, as assigned; this included Delate through 2015 and 2016 on job descriptions and special projects and Robinson in 2016 on the Dulles Airport Ambassador Program and the Customer Service Initiative.

52. I recall attending the MWAA Management Forum on February 25, 2015. During this meeting, MWAA's General Counsel, Phil Sunderland, described a lawsuit brought against MWAA. As is typical of these MWAA executives-managers meetings, there were approximately 80 to 100 MWAA executives-managers present. I recall that Potter, Vegliante and McKeough attended this meeting. During this meeting, Sunderland stated that it would be nice if someone assassinated the lead plaintiff in a major lawsuit against MWAA. At the time, I thought Sunderland was joking. I did not receive any indication from any of the MWAA management personnel present that Sunderland's joke about killing or assassinating someone was improper or against MWAA policy in actuality even though I knew it was against MWAA's written policies.

53. On 01-14-16, during the HR Managers Meeting, I reported that MWAA continued to fail to address the concerns raised by DOT OIG within their Reports and that MWAA continued to violate Title VII.

54. From January to November 2016, I reported violations of Title VII in job grading, including the July 2016 disclosure of preferential treatment regarding Reggie Clark.

55. In June and July 2016, I reported to Mr. Vegliante that "there appears to be disproportionate adverse treatment on women in the H COLA pay program."

56. On 10-19-16, I disclosed to Board Member Tony Griffin that I believed MWAA violated key terms and provisions of "Federal-MWAA contracts and grants" and that I "was the primary whistleblower against MWAA's wrongdoing in years prior and had come forward to work

with DOT-OIG concerning the wrongdoing and, as a result, had been retaliated against by MWAA."

57. MWAA entered into task orders using federal funds after 2013 and I reported violations as pertaining to them in August 2013 to DOT-OIG officials Prather and Engler (along with a host of other information).

58. In 2012, Ms. Gail Endicott told me that Mr. Potter was making her sick.

59. During approximately 2014, Ms. Gail Endicott donated a kidney. She was out of the office for approximately 2 months. Upon her return, she had more frequent complaints about her health.

60. From 2014 to 2016, Ms. Endicott told me that various MWAA employees were making her sick. On 10-22-2014, she told me that Mr. Pulcrano made her so sick by his behavior that day that she had to leave work. She told me in August 2016 that Mr. Rumberg had made her sick due to his poor performance under her leadership.

61. In April 2016, I selected Gail Endicott for the open Senior Compensation Specialist position after a competitive selection process. This selection was a promotion for Ms. Endicott. I made clear to her and all my staff that I expected a notably high level of performance from anyone in in this sole senior position in the Compensation Department. I had demoted Mr. Rumberg from this position because his performance was not at this level.

62. Soon after Ms. Endicott received this promotion, it became apparent that she could not perform at the higher grade level. During 2016, I reminded her that her higher level position required a higher level of performance.

63. Throughout November 2016, up to November 29, 2016, when my administrative leave began, Ms. Endicott continued to work with me without making complaints to me about any

claims that I was abusive to, or harassing, her.

64. When MWAA placed me on administrative leave on November 29, 2016, and required me to leave the building, my offices contained boxes of records, several large file cabinets filled with records, papers on my desktop and my circular table, and other files and records that I want to use as evidence in this matter. These records include some notes of my conversation with Frank Wolf on 3-29-11 including notes where he talked about fungible money. They included notes I had of meetings with DOT-OIG auditors (such as Mackensie Ryan), and emails I had received from Ryan (at work) that included MWAA's statement to DOT-OIG in 2011 (that it did not have legal authority to audit MWAA) and DOT-OIG's statement in response (which prevailed) as to why it did have authority. The papers on my desk and circular table included documents about my Department's compensation surveys up to and including 2016, the ESGR/Vets Outreach initiative (original research and proposal to Potter and Vegliante), documents of racially preferential job grading at MWAA including 4 OSCM downgrades needed per content/equity but prohibited by Vegliante, VP Steve Baker (prohibited by Vegliante), and Budget Officer Rita Alston (prohibited by Vegliante). There were documents about my 10-16-19 meeting with MWAA Board member Tony Griffin. All of these documents were destroyed by MWAA

65. Before I was fired, I had my counsel ask MWAA's attorney (Kletzkin) to place a litigation hold on the contents of my offices. See Exhibit 3. Despite this request, I did not receive any of the documents described in the previous paragraph. I also did not receive my "platoon photo," a photo of the members of my Army basic training platoon, signed by persons in my platoon. This photo is irreplaceable.

66. Peter Delate worked closely with me from May 2013 through 11-29-16 when MWAA

19

escorted me from the building.

67. David Poland was a co-worker of mine for over 25 years. His office (physical location) was directly across from my office (physical location) the last 2.5 years of my tenure (Summer 2014 through November 2016). In terms of location, Poland was closest to me of any MWAA employee.

68. Ms. Lewis did not interact with me on a daily basis and she never attended any of the regularly held Compensation Staff meetings.

    I declare under penalty of the laws of the United States that the foregoing is true and correct.

    Dated this 23rd day of September, 2019.

_____
(Signature)