IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

KENNETH PRITCHARD, )
)
Plaintiff, )
)
v. )    Civil Action No. 1:18-cv-1432 (AJT/TCB)
)
METROPOLITAN WASHINGTON )
AIRPORTS AUTHORITY, )
)
Defendant. )
_____)

## MEMORANDUM OPINION AND ORDER

On February 7, 2017, Plaintiff Kenneth Pritchard was terminated from his employment

with Defendant Metropolitan Washington Airports Authority ("MWAA"). At the time of his

termination, he was the Manager, HR Policy, Strategy & Compensation Programs, reporting

directly to Anthony Vegliante, Senior Vice President of Human Resources and Administrative

Services. Following that termination, he filed this action in which he alleges (1) termination of

his employment in retaliation for his protected Title VII disclosures concerning MWAA's

unlawful employment practices (Count I); (2) creation of a retaliatory hostile work environment

in violation of Title VII (Count III)[1]; (3) termination in retaliation for Plaintiff's protected

disclosures as a "whistleblower" in violation of National Defense Authorization Act for Fiscal

Year 2013 ("NDAA") and the American Recovery and Reinvestment Act ("ARRA") (Count IV);

and (4) creation of a retaliatory hostile work environment in violation of NDAA and ARRA

(Count V). [Doc. No. 31], First Amended Complaint ("Am. Compl."), 20–26. He seeks

_____

[1] Plaintiff had also asserted, but has now withdrawn, a claim in Count II of his Amended Complaint for termination
on the basis of race and sex in violation of Title VII.

declaratory and injunctive relief, equitable relief, compensatory damages, back pay, and fees and costs. *Id.*

MWAA has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. [Doc. No. 44], Defendant's Motion for Summary Judgment. For the reasons set forth below, the Defendant's Motion for Summary Judgment will be **GRANTED.**[2]

## I. BACKGROUND

Unless otherwise noted, the following facts are undisputed:

Plaintiff, a white male, was employed by MWAA from 1988 until his termination on February 7, 2017, working primarily in the Office of Human Resources and Administrative Services ("OHR"). At the time of his termination, his title was Manager, HR Policy, Strategy & Compensation Programs in OHR, a position he had held since 2002.

Arl Williams served as Vice President of Human Resources and was Plaintiff's direct supervisor until Williams' resignation in November 2011.

John E. Potter has served as President and Chief Executive Officer of MWAA since July 2011 and supervised Plaintiff on an interim basis following Williams' resignation until May 2013.

Anthony Vegliante was hired by MWAA on May 20, 2013 to serve in his present role as Sr. Vice President of OHR and since that date has served as Plaintiff's direct supervisor. Vegliante proposed Plaintiff's termination on January 19, 2017 and terminated Plaintiff on February 7, 2017.

---

[2] Also pending is Defendant's Motion *in Limine* [Doc. No. 53], which will be denied as moot.

Gail Endicott, a white female, began working for MWAA in Plaintiff's department in 2006 and worked under Plaintiff's supervision from 2006 until Plaintiff was put on administrative leave on November 28, 2016.

On November 2, 2016, Endicott made a complaint against Pritchard to Robin Wade, the manager of Employee and Labor Relations within the Office of Human Relations. At that time, Endicott told Wade that Plaintiff "routinely yelled," "often used profane language," asked her to investigate other Airport Authority employees, and threatened to fire her and others in her work group if they cooperated or helped Vegliante or others in executive management and that she "finally couldn't take it anymore," claiming that Pritchard's conduct had caused her significant emotional and physical distress, resulting in weight gain, stomach and intestinal issues and headaches.

That same day, November 2, 2016, Wade told Vegliante of Endicott's complaint and recommended that an investigation be done. Wade also spoke to Bruce Heppen, the MWAA's Associate General Counsel for employment matters, regarding Ms. Endicott's complaint, and Heppen and Wade agreed that outside counsel should be brought in to conduct the investigation. Heppen made that recommendation to Vegliante, who agreed. On November 4, 2016, Heppen then contacted Morris Kletzkin, Esq., an attorney with Friedlander, Misler, one of two firms that MWAA had pre-qualified for employment matters. Kletzkin was subsequently retained to conduct the investigation and received a Statement of Work on November 14, 2016.

During his investigation into Endicott's complaint, Kletzkin interviewed fourteen (14) people, including, among others, Endicott and Plaintiff, and reviewed numerous documents and e-mails. Following the conclusion of his investigation, Kletzkin submitted to MWAA a written report dated January 17, 2017. [Doc. No. 45-8]. In the report's Executive Summary, he stated:

It seems clear from the evidence adduced to date that Mr. Pritchard is, and has been, very angry and frustrated with most, if not all, of the managers at the Airports Authority. His anger and frustration stem from his belief that things are not being done correctly, and that the executive management is violating federal and state law, as well as Airports Authority rules and regulations. Mr. Pritchard's anger is expressed not only to those in the Compensation Group, but to anyone who is willing to listen. Indeed, Mr. Pritchard seems to take pleasure in pointing out mistakes and shortcomings of his fellow managers on a regular and routine basis. Mr. Pritchard's anger and outbursts have caused his follow employees discomfort and they avoid him when possible.

Mr. Prichard's obsession and hatred of the executive management of the Airports Authority is no secret. Two of the five Compensation Specialists report that Mr. Prichard's behavior makes them uncomfortable and is unprofessional. The other Compensation Specialists confirm Mr. Pritchard is loud and sometimes demonstrates aggressive behavior, but either claim it is not disruptive or that they ignore it. Two of Mr. Pritchard's direct reports have asked him to calm down, have closed their doors at times to avoid listening to him, or have asked him to stop the behavior.

While Mr. Pritchard has manifested this behavior for many years, the level of his opprobrium seems to have increased in the past year with respect to at least one Airports Authority employee, which resulted not only in emotional distress, but caused physical symptoms.

The evidence obtained, both from interviews and documents, supports the conclusion that Mr. Pritchard has repeatedly engaged in conduct that can be described as offensive, intimidating and disruptive. Witnesses confirm that he routinely yells at his subordinates; curses; aggressively gesticulates; and derides, denigrates, and disrespects his fellow managers and the Airports Authority executive leadership. His behavior has caused his subordinates discomfort, illness and emotional distress. Moreover, he has no respect for Mr. Vegliante or Mr. Potter. It is the conclusion of the investigator that Mr. Pritchard has violated Sections 2.3(a)(1), 2.3(a)(10), 2.3(a)(11), 2.3(a)(8), and 2.3(a)(15) of the Conduct and Discipline Directive.

Kletzkin also stated that "[t]he charge of insubordination and abuse of his position developed during the course of the investigation as a result of multiple reports that Mr. Pritchard had repeatedly disparaged his supervisors and had engaged in conduct that abused his position as a Manager of the Airports authority." [Doc. No. 45-8].

The report also summarized the information Kletzkin had received from the fourteen individuals he had interviewed and stated the following overall Findings:

The evidence obtained during this investigation demonstrates that Mr. Pritchard has been angry and frustrated with the Airports Authority for many years. That anger has in recent times been directed more and more to his direct reports and follow managers. His hatred and disdain for executive management at the Airports Authority is repeatedly articulated.

While there are at least two of Mr. Pritchard's direct reports that do not find his behavior objectionable, in some respects they confirm it has occurred. Mr. Pritchard's behavior toward the Complaining Witness has, however, been corroborated by others and partially confirmed by Mr. Pritchard.

Mr. Pritchard's insolence, aggressive and intemperate behavior has negatively affected the workforce and the unit which he supervises, the HR Department at large, and the larger Airports Authority institution.

Mr. Pritchard's behavior has adversely affected the complaining witness as corroborated by another direct report. The Complaining Witness [Endicott] has reported emotional distress as well as physical distress all as a result of Mr. Pritchard's intemperance and hostility. Mr. Pritchard's behavior has adversely affected others in the HR Department, who not only object to his rants, but actively avoid him because he has made it difficult for them to work with him. Mr. Pritchard's insolence and disparagement of his managers and the executive leadership adversely affects the institution for which he works. As a result of this anger and hatred, Mr. Pritchard has created a workplace atmosphere that can be described as hostile. Lastly, Mr. Pritchard has abused his position as a Manager of the Airports Authority. He has asked his subordinates to check up on other Airports Authority employees, specifically what time they arrived at work and where and for how long they park their cars. Moreover, Mr. Pritchard continued an initiative regarding Reservists and National Guard members when he was told by his Manager that the Airports Authority would not go forward with such an initiative. He continued to work on the initiative as a 'private citizen,' continued to develop the same using Airports Authority resources and presented the initiative to a board member. In doing so, Mr. Prichard abused the office entrusted to him by clearly disregarding a policy decision that had been dictated by his managers. Mr. Pritchard's behavior in this regard clearly shows his disdain for his employer. As such, this investigator finds as follows:

      1. Mr. Pritchard has behaved in ways that are offensive to his coworkers and others by yelling, screaming, grunting, gesticulating, slamming doors, and making threatening faces all in violation of Section 2.3(a)(1) of the Conduct and Discipline Directive;

      2. Mr. Pritchard has repeatedly used profane language in the workplace and has employed obscene gestures in violation of Section 2.3(a)(10) of the Conduct and Discipline Directive;

3. Mr. Pritchard has attempted to bully and intimidate his direct reports by instructing them not to speak with the Vice President of Human Resources and others, and by being intemperate with, and yelling at them, in violation of Section 2.3(a)(11) of the Conduct and Discipline Directive;

4. Mr. Pritchard's repeated reference to the President and Vice President of the Airports Authority as "idiots and incompetents," constitutes such insolence that he is in violation of Section 2.3(a)(8) of the Conduct and Discipline Directive;

5. Mr. Pritchard's employment of his subordinates to report on other Airports Authority employees and his continued use of Airports Authority resources including the recruitment of Airports Authority employees to assist him in his private submission of an HR initiative that was not sponsored by the Airports Authority is a fundamental abuse of his duty of loyalty and his position as a manager; and

6. Mr. Pritchard's behavior towards the Complaining Witness is also violation of the Workplace Violence Directive since the Complaining Witness informed Mr. Pritchard that his conduct was making her sick, and Mr. Pritchard failed to moderate his objectionable conduct.

By letter dated January 19, 2017, Vegliante advised Pritchard of the results of the investigation and Kletzkin's finding of improper conduct, together with his decision to propose that Plaintiff be terminated for his various violations of the Conduct and Discipline Directive. [Doc. No. 61-8]. In that regard, he advised Plaintiff that he "had completely lost confidence in [him] and in [his] ability to effectively manage other personnel and to further the mission of the Airports Authority." *Id.* He invited Plaintiff to respond to the proposed termination, "personally or in writing, or both," together with affidavits or other documentary evidence in support of his reply. *Id.* By letter dated February 2, 2017, Plaintiff responded, through counsel, without additional submissions. [Doc. No. 61-10]. In that response, Plaintiff contended that he had been denied due process and that the termination was based on "specious and unsupported allegations" and was in retaliation for his "whistleblowing" over the years. *Id.* By letter dated February 7, 2017 to Plaintiff, Vegliante responded to the substance of that letter and advised that,

"[i]n my opinion, the letter does not rebut the charges contained in my letter of January 19, 2017" and that "I have therefore determined to terminate your employment with the Airports Authority effective February 7, 2017," with his letter serving as notice of Plaintiff's termination. [Doc. No. 61-11]. He was also advised concerning the review process and procedures available to him with respect to his termination. Plaintiff did not use those procedures, *see* [Doc. No. 45], at 2, ¶ 37, but rather filed his Charge of Discrimination with the EEOC on August 2, 2017, Am. Compl. ¶ 14.

Plaintiff's claims, and his termination, take place against the backdrop of Plaintiff's long history of complaints and statements about MWAA's practices and policies.[3]  In that connection, Plaintiff alleges that during the period from 2010 to 2017, he engaged in "protected activities" pertaining to (1) MWAA's Title VII and other anti-discrimination law violations; (2) the hiring of friends and relatives "for quid pro quo reasons" and as favors to MWAA Board members, executives and managers; (3) procurement contracting violations, including improper use of Federal funds, awarding contracts to Board members and friends of Board members; (4) abusive travel by Board members; (5) theft of MWAA property; (6) the improper use of funds in exchange for political contributions; (7) preferential treatment in pay grades to African American employees; (8) discrimination against female employees relative to men with respect to pay increases; (9) the adverse impact on minorities of certain certification requirements that exceeded job requirements; (10) prejudicial remarks by Vegliante concerning white applicants and employees in certain MWAA jobs; (11) delays by police officers in responding to vehicles and people that were stopped in the arrival and departure areas of the terminals; (12) Defendant's

---

[3] Those complaints and statements can be approximately divided into those that occurred while Plaintiff served under the direct supervision of Williams and those that occurred while under the direct supervision of Williams' successors following Williams' resignation on November 6, 2012, specifically Potter until May 2013, and thereafter, Vegliante until Plaintiff's termination on February 7, 2017.

early and restricted recruitment for selected jobs before job descriptions and qualification requirements were made official or vacancies announced, including a failure to post all job vacancies as required; and (13) retaliation against him for making the complaints, including instituting Kletzkin's investigation and his termination. *See* Am. Compl ¶¶ 20–35.

He also alleges that in retaliation for engaging in these protected activities, he was subjected to a hostile work environment, culminating in his termination on February 7, 2017. That alleged hostile work environment included, from 2010 to 2012 while under the supervision of Williams, a series of actions that diminished his job in "scope, effect, and level." More specifically, Plaintiff alleges that while serving under Williams, he (1) was excluded or "disinvited" from meetings or groups, including the Management Forum; (2) was denied access to information; (3) was the subject of a false ethics complaint by Williams, who threatened to remove him as a contracting officer; (4) had eliminated certain functions from his job scope; (5) had information withheld from him; (6) was not authorized to fill certain open job positions in his department or extend a support contract for his department; (7) had reassigned staff from his department, "thereby reducing Plaintiff's staff of 2 by 50 percent to one fulltime subordinate"; (8) beginning in June 2012, had reduced "in stages" his "standing" from that of a department manager to a division supervisor, a process that was "rescinded" in November 2012; (9) was called by Williams in e-mails and in person a "hypocrite," a complainer and a person "of "limited comprehension," who should "demote himself" from a manager to "a less demanding job"; (10) was described in a comment to another co-worker by an employee reporting to Williams as "crazy" and "What planet is that boy from"; (11) had cancelled "prematurely" Plaintiff's temporary pay increase; (12) had cancelled Plaintiff's pre-approved attendance at three training-seminars; (13) was threatened with "outsourcing" his job, which Plaintiff

understood as "an implied threat" to terminate him and his staff; (14) was "publicly humiliated" when his office was relocated away from his staff and next to Williams' office (Plaintiff was relocated back to his old office in April 2013); and (15) was denied "prestigious and rare" internal leadership and training opportunities in 2012 (and again in 2015). *See* Am. Compl. ¶ 38.

During the period of 2013 to 2017, after Williams' resignation, Plaintiff alleges that he was again subjected to a hostile work environment through (1) a series of actions by CEO Potter, including Potter's telling Plaintiff in March 2013 to "stop acting like an auditor," telling other employees that he used to think Plaintiff was "crazy," Potter's "barging into a private meeting" between Plaintiff and an MWAA Board member, and submitting to the MWAA Board a functional description of MWAA staff that reduced Plaintiff's "organizational rank" from department manager to division manager; (2) MWAA's refusing to reimburse him for paid Internet access at a hotel during pre-approved employee travel; (3) delaying or withholding information to the Plaintiff that related to Plaintiff's job duties; (4) excluding Plaintiff from meetings; (5) transferring work from Plaintiff's department to the staff of other departments; (6) refusing to pay Plaintiff overtime as a non-exempt FLSA employee after it removed the FLSA-exempt content of his job, and then threatening to make Plaintiff repay overtime he had received in 2012; (7) subjecting Plaintiff to "secretive and internal investigations" to find individuals who provided information to outside regulatory and law enforcement agencies and the news media about MWAA wrongdoing; (8) MWAA's falsely accusing him of the conduct included in the Endicott complaint against him; (9) "stealing" his documents; and (10) placing him on administrative leave with pay on November 28, 2016, subjecting him to the Kletzkin's investigation and terminating him on February 7, 2017. *Id.*

On August 2, 2017, Plaintiff filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging discrimination by subjecting him to a hostile work environment and by terminating his employment due to race, age, sex and in retaliation for his protected activities under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq. On March 28, 2018, Plaintiff filed a complaint with the Department of Transportation Office of the Inspector General (DOT OIG), alleging violations of the American Recovery and Reinvestment Act ("ARRA"), Pub. L. 111-5, 123 Stat. 297–99, Section 1553 and 48 C.F.R. § 3.907, et seq.; and Section 828 of the National Defense Authorization Act ("NDAA") of 2013, 41 U.S.C. § 4712. He filed this action on November 19, 2018.

## II. LEGAL STANDARD

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996). The party seeking summary judgment has the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a

genuine issue for trial." *Anderson*, 477 U.S. at 248. Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *See Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007) (citing *Anderson*, 477 U.S. at 255). "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000). Further, "the court should give credence to the evidence favoring the nonmovant as well as 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'" *Id.*

### III. ANALYSIS

#### A. Retaliatory Termination (Count I)

Plaintiff first alleges that he was terminated in retaliation for engaging in activities protected under Title VII. Am. Compl. ¶ 45. To establish a *prima facie* case of retaliatory discharge under Title VII, a plaintiff must show: (1) that he engaged in protected activity; (2) that the employer took a materially adverse employment action against the plaintiff, and; (3) that a causal connection exists between the protected activity and the adverse employment action. *See King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003); *see also Pepper v. Precision Valve Corp.*, 526 F. App'x 335, 336 (4th Cir. 2013) (declining to adopt the rule from *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 49394 (D.C. Cir. 2008), which allows courts to skip analyzing the plaintiff's prima facie case at the summary judgment stage). The burden then shifts to the

employer "to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions." *King*, 328 F.3d at 151. The burden of persuasion remains with the employee to show this reason was a pretext to disguise the true retaliatory reason for his termination. *Id.* If the employee can demonstrate that there is a genuine dispute of material fact on the question of pretext sufficient to make the employer's proffered justification a triable issue, the court must not grant summary judgment. *Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 217–18 (4th Cir. 2016).

Plaintiff alleges he engaged in protected Title VII activity from 2010 to 2016 by repeatedly reporting perceived violations of Title VII. Am. Compl. ¶ 20. These included complaints that African American employees were paid higher than comparably situated Caucasian employees and that men, but not women, were receiving pay increases. *Id.* ¶ 26; *see also id.* ¶ 30 (2015 alleged protected activities). It is also undisputed that Plaintiff suffered a material adverse employment action by being terminated. What is at issue is whether there is sufficient evidence of a causal connection between the Plaintiff's Title VII protected activities and his termination.

In order to establish the required causal connection, the employer must have taken the adverse employment action "*because* the plaintiff engaged in protected activity." *Perkins v. Int'l Paper Co.*, No. 18-1507, 2019 WL 4018288, at *10 (4th Cir. Aug. 27, 2019) (citing *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original)). Evidence of a causal connection can be shown through a sufficiently close temporal relationship between the employment action and the protected activity. *See Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (observing that three to four months are not sufficiently close in time to establish a causal connection on the basis of temporal proximity alone); *but see Williams v. Cerberonics*,

*Inc.*, 871 F.2d 452, 457 (4th Cir. 1989) (finding four months to be sufficient time to establish causation at the prima facie stage).

In his Amended Complaint, Plaintiff alleges that he informed Vegliante, "beginning in Summer 2016 and culminating in November 2016," of adverse impact on women employees involving administration of the H COLA program and disparate treatment as between three African-Americans (whose over-graded positions were not downgraded) and a Caucasian employee (whose over-graded job position was downgraded). *See* Am. Compl. ¶¶ 26(e), 26(g). But the only evidence contained in the record concerning this alleged Title VII protected activity is Plaintiff's affidavit attached to his opposition in which he states in a conclusory manner that "[f]rom January to November 2016, I reported violations of Title VII in job grading, including the July 2016 disclosure of preferential treatment regarding Reggie Clark," [Doc. No. 59-4] ¶ 54, and "[i]n June and July 2016, I reported to Mr. Vegliante that 'there appears to be disproportionate adverse treatment on women in the H COLA pay program.'" *Id.* ¶ 55. Endicott filed her complaint that triggered the investigation on November 2, 2016; Kletzkin was officially hired to conduct an investigation on November 14, 2016; Plaintiff was placed on administrative leave with pay on November 28, 2016; Kletzkin issued his report and findings on January 17, 2017; Vegliante proposed termination on January 19, 2017; and Plaintiff was terminated on February 7, 2017. Recognizing that evidence of causal connection at this stage is to be liberally construed, *see Perkins v. International Paper Co.*, 936 F.3d 196, 214 (4th Cir. 2019), the Court assumes without deciding that Plaintiff has proffered sufficient evidence of causation based on temporal proximity and based on that ruling, that he has established a prima facie case of retaliatory discharge under Title VII.

Once a Plaintiff has put forth its prima facie case, the burden shifts to the Defendant to put forth a legitimate nondiscriminatory reason for the termination. *King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003). Defendant has clearly done so here, asserting that Plaintiff was fired after a subordinate made a complaint, that complaint was investigated by an outside law firm, and as reflected in the findings of that investigation, Vegliante concluded that Plaintiff had violated numerous provisions of MWAA's Conduct and Discipline Directive and MWAA's Workplace Violence Directive. *See Sadeghi v. Inova Health System*, 251 F. Supp. 3d 978, 993–94 (E.D. Va. 2017) ("Insubordination is a legitimate, nondiscriminatory reason for discharge because Title VII does not insulate workers from the consequences of insubordination") (citation omitted). The burden therefore shifts back to Plaintiff to proffer evidence sufficient to show that the reason given is a pretext for unlawful retaliation. *King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003).

A plaintiff can create a factual issue as to pretext by presenting "sufficient evidence to create an inference that the proffered legitimate reason for the employment decision has no basis in fact," *Shortt v. Immigration Reform Law Inst.*, No. 1:11-cv-144, 2011 WL 4738657, at *10 (E.D. Va. Oct.3, 2011), *aff'd*, 480 F. App'x 209 (4th Cir. 2012), or that at various times the employer gave inconsistent explanations for the termination, *see E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852–53 (4th Cir. 2001). However, the issue is not whether an employer's proffered explanation was correct or incorrect, but whether the employer honestly believed it was true and the real reason for its termination decision, as demonstrated by its reasonable reliance on the particularized facts that were before it at the time the decision was made. *Tomasello v. Fairfax Cty.*, No. 1:15-cv-95, 2016 WL 165708, at *11 (E.D. Va. Jan. 13, 2016) (citing *Murphy v. Oh. State Univ.*, 549 F. App'x 315, 322 (6th Cir. 2013)). Additionally, there is no requirement

that an investigation be flawless in order to be an appropriate basis upon which to terminate employment, only that the employer's decision was "reasonably informed." *Murphy v. Oh. State Univ.*, 549 F. App'x 315, 322 (6th Cir. 2013).

There is no evidence that Defendant ever gave any inconsistent explanations concerning why it terminated Plaintiff. Therefore, the issue is whether Plaintiff has proffered evidence sufficient to establish that there was no basis in fact for the reason given or that Plaintiff's conduct as documented in the Kletzkin report was not the real reason for his termination—more specifically, whether Vegliante terminated Plaintiff not because of the conduct disclosed in Kletzkin report, but rather because of some animosity based on Plaintiff's Title VII protected activity. Although the Plaintiff in his briefing does not clearly identify the evidence he relies on to establish pretext, it appears from the briefing and oral argument that the Plaintiff relies upon the following contentions to support his claim of pretext:[4]

1. The investigation was inadequate to support Kletzkin's findings and recommendations or Vegliante's reasonable reliance on it; and because the report revealed conflicting information and the evidence against Plaintiff was not "undisputed," the credibility of the witnesses interviewed, as well as Kletzkin's, was "at issue" for a jury to decide. Plaintiff further contends in this regard, specifically as to Endicott, that Endicott "was problematic and a poor performing employee by multiple accounts" and "a reasonable jury could conclude that Ms. Endicott was

---

[4] Notable in connection with Plaintiff's claim of pretext is that he has admitted as undisputed that (1) he may have told employees of the MWAA that he "hates" what Vegliante does; (2) he might have stated that he was "going to get" Vegliante and Potter for things they do "wrong"; (3) he might have referred to Vegliante as an "idiot" or an "incompetent" in front of other MWAA employees; (4) he probably used curse words or profanity during meetings at MWAA; (5) he has probably lost his temper while at work; (6) he has probably yelled or raised his voice in anger while at work; (7) he referred to Vegliante and others as the "brain trust" in a pejorative way to other employees MWAA; and (8) he had asked members of his staff to monitor and report to him the arrival and departure times of other MWAA employees, including primarily his then supervisor Arl Williams and another specific employee. *See* [Doc. No. 66-2] at 10, ¶¶ 25–32.

motivated by self-preservation, rather than any genuine complaints by Mr. Pritchard." *Id.* at 25–26.

2. Endicott complained about not only Plaintiff but also another employee; and another employee complained about Endicott, but only Plaintiff's conduct was investigated.

3. Defendant's "outrage" towards Plaintiff's conduct was a "façade" since Plaintiff's alleged misconduct conduct was "within the norm at Defendant's workplace"—Vegliante had been aware of Plaintiff's behavior before the report, and therefore could not have been "disturbed" by its findings, but rather "exaggerated" the results of the investigation to justify terminating Plaintiff.

4. Vegliante, based on a history of antagonisms between him and the Plaintiff, had decided to retaliate against Plaintiff by terminating him even before the Kletzkin report.

5. Defendant admitted that their actions were motivated by Plaintiff's animosity toward illegal behavior.

None of these contentions, individually or collectively, provide an adequate basis upon which to allow a reasonable inference that Plaintiff was not terminated because of the conduct documented in Kletzkin's report and that Kletzkin's report was used as a pretext to retaliate against Plaintiff for engaging in Title VII protected activity when, "[f]rom January to November 2016, [Plaintiff] reported violations of Title VII in job grading, including July 2016 disclosure of preferential treatment regarding [a certain MWAA employee]." [Doc. No. 59-4] ¶ 54.

With respect to the quality and reliability of the Kletzkin report, Plaintiff essentially contends that because of what he considers to be factual and credibility issues, he is entitled to have a jury decide whether Vegliante made the "correct" decision when he terminated him. But as reflected in the generally recognized principle that federal courts do not act "as a kind of

super-personnel department weighing the prudence of employment decisions," *see DeJarnette v. Corning*, 133 F.3d 293, 299 (4th Cir. 1998), a decision-maker does not need to have "undisputed" evidence of misconduct or a body of evidence free from credibility issues before that decision-maker may act to terminate an employee. Were that the case, employers in few cases could avoid being second-guessed by juries, as there are usually disputed contentions, recollections, and issues of credibility surrounding any workplace controversy, and as a result, employers would no doubt feel themselves severely restricted in their ability to impose discipline for workplace misconduct whenever there are easily made claims of retaliatory animus. Rather, to establish pretext, there must be evidence that creates an inference that the proffered legitimate reason for termination has no basis in fact, and in that regard, the employee must do more than show that an employer's decision was incorrect—an employee must "present evidence reasonably calling into question the honesty of the employer's belief." *Tomasello v. Fairfax Cty.*, No. 1:15-cv-95, 2016 WL 165708, at *11 (E.D. Va. Jan. 13, 2016). An employer's proffered legitimate basis for employment action is considered honestly held if the employer can establish its reasonable reliance on the particularized facts that were before it at the time the decision was made. *Id.* ("The employer does *not* need to show that it conducted a perfect investigation; rather, the employer's decision need only be reasonably informed.") (emphasis in original) (citation omitted). Plaintiff's "own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action." *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989).

Here, there is no evidence from which to infer that the investigation reflected in the Kletzkin report was so flawed or inadequate that it could not serve as the basis for informed decision-making by Vegliante. The investigation included access to pertinent documents and

persons identified as having relevant information, including the Plaintiff and the complainant; Plaintiff was represented by counsel during the investigation and given an opportunity to submit any information he deemed pertinent; the report detailed the substance of the interviews conducted, which supported the investigation's findings of misconduct; and Plaintiff, through counsel, brought to Vegliante's attention what he thought were the inadequacies in the investigation and the evidence. *See* [Doc. No. 61-10]. The flaws that Plaintiff claims infected Kletzkin's report do not raise fundamental concerns as to the adequacy, independence, or fairness of his investigation or the investigator. That Kletzkin's report may not have exhausted all possible avenues of investigation does not preclude Vegliante's reliance on the report or render the report uninformed or pretextual. *See Murphy v. Oh. State Univ.*, 549 F. App'x 315, 322 (6th Cir. 2013) (noting that "[an] employer's decisionmaking process need not be optimal, or leave no stone unturned; rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action"). In sum, there is no evidence from which to infer that the decision had no basis in fact, or that Vegliante did not honestly hold the belief that Plaintiff had engaged in misconduct or that Vegliante did not reasonably rely on the particularized facts that were set forth in the Kletzkin report. There is likewise no evidence from which to infer that Vegliante's decision to terminate Plaintiff had already been made in advance of the Kletzkin report.

Similarly, none of the other contentions establish pretext. There was no admission that Defendant acted out of animosity toward Plaintiff generally, or, more particularly, because of Title VII protected activity.[5] Nor is Defendant's handling of Endicott's complaints against other

---

[5] In support of this contention, Plaintiff points to the statement in Kletzkin's report that "[Pritchard's] anger and frustration stem from his belief that things are not being done correctly, and that the executive management is violating federal and state law, as well as Airports Authority rules and regulations," and the deposition testimony of General Counsel Sunderland that Pritchard had "Balkanized" the employment staff. *See* Opposition Memorandum,

employees or other employees' complaints against Endicott sufficiently probative of pretext.[6]

Likewise, there is no evidence to even suggest that the totality of Plaintiff's documented conduct, in terms of its substance, duration, scope, effect and intensity, was somehow "within the norm" of accepted or tolerated behavior at MWAA; or that Vegliante was previously aware of the totality of that documented conduct; or that Vegliante exaggerated the findings of misconduct or was not truly "disturbed" by them.[7] Finally, issues raised as to Endicott's performance and her motivations pertain to her credibility, an issue to be considered by the decision-maker. Absent evidence that Vegliante did not believe Endicott's complaints, which were amply corroborated by multiple witnesses, Plaintiff's perceptions and contentions, as well as those of other employees, concerning her performance level and motivations are irrelevant. *See Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996) (explaining that the assessment of coworkers or the plaintiff is irrelevant; it is the perception of the decisionmaker that matters).

---

at 25; *see also* [Doc. No. 62-2], Deposition of Philip Sunderland, at 96:3–21. Neither supports directly or by reasonable inference that MWAA had "admitted" that it acted out of animosity toward Pritchard's alleged protected disclosures. Kletzkin's report simply observed that Pritchard's unacceptable behavior appeared to issue out of *his* anger with management over what he viewed as unlawful activities within MWAA; and Sunderland's observation referenced Pritchard's divisive role within the employee ranks. Whatever may have been the Plaintiff's motivation for engaging in disruptive conduct found to violate workplace rules, it did not constitute a license to engage in improper conduct or confer upon him an immunity from discipline. *See Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981) (Title VII does not immunize "insubordinate, disruptive, or nonproductive behavior at work."); *see also Rollins v. State of Florida Dep't of Law Enforcement*, 868 F.2d 397, 400–01 (11th Cir. 1989) (Title VII does not insulate from discipline an employee who engages in insubordinate, hostile or disruptive behavior in connection with protected Title VII activity).

[6] Not only are those complaints substantially different in substance and duration, they do not directly involve actions or non-actions taken by Vegliante.

[7] In support of this contention, Plaintiff cites evidence that MWAA was aware "that Mr. Pritchard has always been, at times, hot-tempered and irascible," relying on Potter's testimony that Plaintiff did not work well with a previous coworker, Kletzkin's testimony about the general characterizations he received from witnesses during his report, the report's reference to evaluations from the mid-1990s that noted he became angry and frustrated at times, and the affidavit of Peter Delate, who testified that he did not notice any change in Plaintiff's behavior from May 2013 to November 2016. *See* Opposition Memorandum ¶ 22. None of this testimony shows that Vegliante was aware of the extent of Plaintiff's abusive or insubordinate behavior, that he had condoned or tolerated it, or that the conduct documented in the Report did not warrant termination.

For the above reasons, Plaintiff has failed to present sufficient evidence of pretext to rebut Defendant's non-discriminatory and legitimate reason for termination and Defendant is entitled to judgment as a matter of law as to Count I.

## B. Retaliatory Hostile Work Environment (Count III)

Plaintiff alleges that he also was subjected to a hostile work environment in retaliation for his protected Title VII activities.[8] Am. Compl. ¶ 37. To state a prima facie claim for retaliatory harassment, the Plaintiff must plead: (1) engagement in a protected activity; (2) subjection to severe or pervasive retaliatory harassment by a supervisor; and (3) a causal link between the protected activity and the harassment. *Hinton v. Virginia Union Univ.*, 185 F. Supp. 3d 807, 839–40 (E.D. Va. 2016) (*citing Laster v. City of Kalamazoo*, 746 F.3d 714, 731 n.5 (6th Cir. 2014); *see also Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 283 (4th Cir. 2015). The burden then shifts to the employer "to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions." *King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir.

---

[8] As a threshold matter, Defendant argues that Plaintiff's Title VII claim in Count III is time-barred because EEOC charges must be filed within 180 days from the date of the allegedly discriminatory conduct, while Plaintiff claims that since Virginia is a "deferral state," the applicable filing period is 300 days. MWAA is an interstate compact, and because of that status, Plaintiff could not have filed his charge with a "deferral state" or local agency; and there does not appear to be any other work-sharing agreement that extended the 180-day filing period limit, as it would for other employers. Plaintiff was therefore required to file his Charge of Discrimination with the EEOC within 180 days of any alleged violation. *See Parkridge 6 LLC v. U.S. Dep't of Transp.*, No. 1:09CV1312 (LMB/IDD), 2010 WL 1404421, at *6 (E.D. Va. Apr. 6, 2010); *Bowman-Cook v. Washington Metro. Area Transit Auth.*, No. CV-14-1877, 2017 WL 3592450, at *6, n.5 (D. Md. Aug. 21, 2017) (refusing to apply the 300-day limit to charges of discrimination against WMATA, another interstate compact). Plaintiff filed his EEOC complaint on August 2, 2016 and the 180-day period therefore ran from February 3, 2017 through August 2, 2017. *See* [Doc. No. 61-9]. While the only relied upon misconduct that occurred during that time period was Plaintiff's termination on February 7, 2017, a claim of hostile work environment is considered timely if at least one act continuing the violation occurred within the statutory period; a retaliatory termination can be a qualifying act for the purposes of a hostile environment claim, even though it may support an independent claim. *Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 223 (4th Cir. 2016) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116–17 (2002) and *Green v. Brennan*, ___ U.S. ___, 136 S. Ct. 1769 (2016)). Here, Plaintiff alleges in substance that his termination was part of a series of acts that created a hostile working environment, thus sufficiently establishing as timely at this stage his hostile work environment claim in Count III.

2003). The burden of persuasion remains with the employee to show this reason was a pretext to disguise the true retaliatory reason for his termination. *Id.*

Under a retaliation claim, an adverse action need not "affect the terms and conditions of employment," *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62–64 (2006), but there must be "some direct or indirect impact on an individual's employment as opposed to harms immaterially related to it." *Adams v. Anne Arundel Cty. Pub. Schs.*, 789 F.3d 422, 431 (4th Cir. 2015). Severe or pervasive retaliatory harassment will not be found for "minor workplace harms," but rather where a "reasonable employee would have found the challenged action materially adverse such that a reasonable employee would be dissuaded from engaging in protected activity." *Hinton v. Virginia Union Univ.*, 185 F. Supp. 3d 807, 840 (E.D. Va. 2016) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (internal quotations removed)). Under this test, there is a sliding scale of severity versus pervasiveness: a single instance of misconduct is sufficient when it is "physically threatening or humiliating," *e.g.*, *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 268 (4th Cir. 2015), but even numerous instances of misconduct will not establish retaliatory harassment when each instance of misconduct is minor.

As to the first element of his prima facie case, that Plaintiff engaged in Title VII protected activity, the record sufficiently establishes for the purpose of opposing MWAA's summary judgment motion that Plaintiff engaged in Title VII protected disclosures while under the supervision of Vegliante.[9] However, the record is insufficient as a matter of law to establish

---

[9] These Title VII protected activities including the following:

- In July 2016, Plaintiff complained to Vegliante that Vegliante had directed preferential treatment in pay grade (and thus pay range or promotional pay increase) to positions of African American employees. Am. Compl. ¶ 26(c).
- In June and July 2016, Plaintiff informed Vegliante of an adverse impact on female employees through the administration of the H COLA program since most H-employee men had gotten timely pay increases or retroactive pay increases, but most H-employee women had not. Am. Compl. ¶ 26(e).

that Pritchard was subjected to the required severe or pervasive retaliatory harassment; or that

there was a causal link between his protected activity and the alleged harassment. In that regard,

the alleged retaliatory harassment does not rise above the level of workplace "slights," normal

workplace disagreements, or managerial judgments about work assignments. *See, e.g., Thorn v.*

*Sebelius*, 766 F. Supp. 2d 585, 600–01 (D. Md. 2011), *aff'd*, 465 F. App'x 274 (4th Cir. 2012);[10]

*Fordyce v. Prince George's Cty. Maryland*, 43 F. Supp. 3d 537, 552–53 (D. Md. 2014)

("standard, managerial acts . . . exercised in a civil manner" do not constitute materially adverse

employment actions); *see also Nnadozie v. Genesis HealthCare Corp.*, 730 F. App'x 151, 161–

---

- In 2016, Plaintiff complained to Vegliante that MWAA was engaging in discrimination when it failed to "downgrade" key African American employees whose jobs were identified as over-graded and thereby subject to a pay cap, while downgrading or abolishing positions held solely or mainly by Caucasians, including Firefighter Technician and Assistant Fire Marshal positions. Am. Compl. ¶ 26(b).
- In January 2016, during an HR manager meeting, Plaintiff complained to Vegliante and "all other key HR staff present that [MWAA] was granting special favors in employment and other HR domains to favored individuals and groups and that it needed to stop." Am. Compl. ¶ 26(a).
- On January 18, 2015, during an HR manager meeting, Plaintiff informed Vegliante and others that MWAA was about to establish job certification requirements for subprofessional procurement staff that were significantly higher than the content of their job required and which would have an adverse impact on minority staff. Am. Compl. ¶ 30(a).
- From 2014 to 2015, Plaintiff perceived bias against white males based on Vegliante's comments and opposed Vegliante's stated intention to hire fewer white employees and more minorities into trade and public safety jobs. Am. Compl. ¶ 30(g).
- On multiple occasions Plaintiff expressly stated that he was being retaliated against for engaging protected activity. *See, e.g.*, Opposition Memorandum, 10–12 ("On April 1, 2014, Mr. Pritchard advised Mr. Potter that he was "experiencing continuing retaliation" and "On May 29, 2013 . . . [Pritchard] told Mr. Vegliante: 'Your act right now is retaliation'" in response to their conversation about collecting overtime pay from Pritchard).

Plaintiff includes in the Amended Complaint a number of other instances he describes as "protected activities," but there appears to be no support for those activities in the record beyond Plaintiff's general assertions in the Amended Complaint that they occurred. *See* Am. Compl. ¶¶ 26(d), 26(g), 30(b), 30(d), 30(e), 30(f), 30(h), 31.

[10] In *Thorn*, the plaintiff alleged he was subjected to a hostile work environment in the following ways: (1) "he was informed . . . that he would not be a part of the design team"; (2) "he was not offered any new learning opportunities . . . ."; (3) "he received an email on December 30 removing him from his duties and responsibilities as patient appointment system manager"; (4) he received an email threatening disciplinary action in June 2003; (5) his tour of duty change in July 2003; (6) he was denied a transfer request in September 2003; (7) his supervisor instructed a telephone systems contractor to no longer work with Thorn; (8) he received an August 2004 Letter of Instruction; (9) he did not timely receive a compliment in August 2004; and (10) he received "unwarranted reprimands" that came in several emails in 2004. *Thorn*, 766 F. Supp. 2d 585, 600–01 (D. Md. 2011), *aff'd*, 465 F. App'x 274 (4th Cir. 2012). The court found that these instances of "harassment" cited by the plaintiff "hardly constitute[d] harassment at all" and "[t]hey certainly do not amount to an adverse action." *Id.* at 601.

62 (4th Cir. 2018) (upholding district court finding that "allegations of poor performance evaluations, workplace disagreements[], an additional workload, and an office relocation simply cannot demonstrate an environment 'permeated with discriminatory intimidation' on account of [plaintiff's] national origin" sufficient to establish a prima facie case of discriminatory hostile work environment). As to causation, the record is insufficient to establish temporal proximity between his protected Title VII activity and any alleged harassment, other than arguably his administrative leave on November 28, 2016 and his termination on February 7, 2017, as analyzed previously. In any event, even assuming that Plaintiff had established a prima facie case, for the reasons previously discussed with respect to his claim for retaliatory termination in Count I, MWAA has articulated a legitimate, non-discriminatory reason for placing him on administrative leave on November 28, 2016 and terminating him on February 7, 2017, and the Plaintiff has failed to present evidence sufficient to establish pretext as a matter of law.

**C. Whistleblower Claims.**

Plaintiff alleges in Counts IV and V that he is a protected whistleblower under NDAA and ARRA and that he made multiple disclosures of violations of federal contracts and grants, gross mismanagement of federal contracts and grants, gross waste of federal funds, abuse of authority related to federal funds and substantial danger to public health and safety. *See* Am. Compl. ¶¶ 71, 77. In Count IV, he claims that he was terminated in retaliation for his protected activity under NDAA and ARRA, and in Count V, that he was subjected to a hostile work environment culminating in termination in retaliation for his protected activity under NDAA and ARRA.

The NDAA applies only to (A) all federal contracts and grants awarded on or after July 1, 2013; (B) all task orders entered on or after July 1, 2013 pursuant to federal contracts awarded

23

before, on, or after such date; and (C) all federal contracts awarded before July 1, 2013 that are modified to include a contract clause providing for the applicability of such amendments. Pub. L. 112–239, div. A, title VIII, § 828(b), Jan. 2, 2013, 126 Stat. 1840. For an employee to be protected, the NDAA requires (1) the employee to reasonably believe he was disclosing evidence of "gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract . . . or grant[,]" 41 U.S.C. § 4712(a); (2) the employee made his protected disclosures to a "required person," defined as a "management official or other employee of the contractor, subcontractor, or grantee who has the responsibility to investigate, discover, or address misconduct[,]" 41 U.S.C. § 4712(a)(2)(G); and (3) the protected disclosure was a "contributing factor" to an adverse personnel action. 41 U.S.C. § 4712(c)(6)) (adopting burdens of proof under 5 U.S.C. § 1221(e)(1)); *see generally Craine v. Nat'l Sci. Found.*, 687 F. App'x 682, 690 (10th Cir. 2017). Even if the employee meets that burden, the employer need not take any corrective action if it presents "clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure." 5 U.S.C. § 1221(e)(2).

Similar to the NDAA, ARRA's anti-retaliation provision "protects employees who disclose information that the employee reasonably believes is evidence of: (1) gross mismanagement of an agency contract or grant relating to covered funds; (2) a gross waste of covered funds; (3) a substantial and specific danger to public health or safety related to the implementation or use of covered funds; (4) an abuse of authority related to the implementation or use of covered funds; or (5) a violation of law, rule, or regulation related to an agency contract (including the competition for or negotiation of a contract) or grant, awarded or issued relating to

covered funds." ARRA, Pub. L. No. 111-5, § 1553(a), 123 Stat. 115 (2009). "Covered funds"

are defined as "any contract, grant, or other payment received by any non-Federal employer if

(A) the Federal Government provides any portion of the money or property that is provided,

requested, or demanded; and (B) at least some of the funds are appropriated or otherwise made

available by this Act." ARRA § 1553(g)(2). Similar to the requirements under the NDAA, to

prevail under ARRA's whistleblower provision, a plaintiff must show by a preponderance of the

evidence that he made a protected disclosure, he suffered a reprisal, and the protected disclosure

was a contributing factor in the reprisal. *See* ARRA § 1553(a), (c)(1)(A). If the plaintiff proves

these elements, the employer can rebut the claim by showing, through clear and convincing

evidence, that the employer "would have taken the action constituting the reprisal in the absence

of the disclosure." *See* ARRA § 1553(c)(1)(B); *Hadley v. Duke Energy Progress, LLC*, 677 F.

App'x 859, 861 (4th Cir. 2017). A "contributing factor" is something less than a "substantial" or

"motivating" factor. *Addis v. Department of Labor*, 575 F.3d 688, 691 (7th Cir. 2009).

Plaintiff contends that he made protected disclosures under the NDAA and ARRA, but

the record fails to establish as a matter of law that Plaintiff made a disclosure protected under

either NDAA or ARRA.

As to Plaintiff's NDAA claim, with one exception, all of his NDAA-based claims

pertained to the use of federal funds that occurred before July 1, 2013, and therefore were not

protected under the NDAA, *see* Pub. L. 112–239, div. A, title VIII, § 828(b), Jan. 2, 2013, 126

Stat. 1840. The one exception is the following disclosure to Heppen on November 18, 2016:

> Plaintiff reported a Police Officer's allegation that Defendant emergency dispatch
> operations adversely affected safety and security because some emergency dispatchers
> took too long to provide, inter alia, warrants and warnings about vehicles and people that
> were stopped and called into dispatch by Police Officers. These delays were especially
> worrisome in auto arrival and departure areas of the terminals, given potential acts of
> terrorism (involving vehicles and/or baggage) that can result in mass casualties. The

Police Officer's allegation came to Plaintiff through a staff member in accordance with the Exit Interview Program; the exiting Police Officer was frustrated that Defendant's Police Department and Office of Public Safety chain-of-command (already alerted to this matter) had not corrected the situation. Plaintiff provided information about this matter in person and in writing (including the Exit Interview paperwork) to Defendant Employment Attorney Bruce Heppen on or about November 18, 2016.

Am. Compl. ¶ 29. This disclosure, however, fails to constitute "protected activity" under the NDAA for three reasons.

First, the record fails to sufficiently establish that his disclosure related to any post-July 2013 contracts or task orders. In that regard, Plaintiff argues that his disclosure related to funds issued under post-July 2013 task orders. *See* Opposition Memorandum, at 27 ("Here, Mr. Pritchard's disclosures involved task orders that occurred after July 1, 2013. Ex. 4, Pritchard Aff., ¶ 57"). But the only evidence Plaintiff has presented to support this claim is his own affidavit in which he conclusorily states that post-July 2013 issued task orders were issued without any evidence that they related to the activities in the November 2016 disclosure. [Doc. No. 59-4], Affidavit of Kenneth Pritchard ("Pritchard Aff.") ¶ 57 ("MWAA entered into task orders using federal funds after 2013 and I reported violations as pertaining to them in August 2013 to DOT-OIG officials Prather and Engler (along with a host of other information)"). That evidence is insufficient as a matter of law to establish a protected NDAA disclosure, particularly in light of the detailed, uncontested declarations of knowledgeable MWAA employees affirming that no NDAA or ARRA funds were involved in the activities complained of in Plaintiff's November 18, 2016 disclosure.[11]

---

[11] It is undisputed that Plaintiff's November 18, 2016 disclosure related to the activities of the Public Safety Communications Control unit of MWAA; and as reflected in the uncontested declarations from two MWAA employees involved in and knowledgeable about MWAA funding, no ARRA funds relate to the disclosed activities. *See* [Doc. No. 45-15], Affidavit of Brooke Belete ("Belete Aff.") ¶ 5 [Doc. No. 45-14], Affidavit of Ann Field ("Field Aff.") ¶ 5, 6; *see also* Belete Aff. (noting that two cost-sharing agreements with TSA that may relate to the complained of activities were explicitly entered into pursuant to TSA's "other transaction" authority and the agreements are "not . . . procurement contract[s], grant[s], or cooperative agreement[s]").

Second, the record does not sufficiently establish that Plaintiff made his relied upon NDAA disclosure to a "required person," defined under NDAA in relevant part as a "management official or other employee of the contractor, subcontractor, or grantee who has the responsibility to investigate, discover, or address misconduct." 41 U.S.C. § 4712(a)(2)(G). Heppen, to whom the disclosure was made, had no responsibility to review or address allegations made in the disclosure; and Plaintiff failed to make the disclosure to anyone who did have such responsibility, or to make the disclosure in accordance with the process outlined in the Conduct and Discipline Manual, which directs employees to report fraud and ethical violations to the "My Concern Is" Hotline and notes that all information reported to the hotline will be forwarded by the Office of Audit to the appropriate Airports Authority Office for follow-up or investigation. [Doc. No. 45-1], Conduct and Discipline Manual, at 16.[12]

Third, the record is insufficient to establish that Plaintiff's November 18, 2016 disclosure was a contributing factor to his February 7, 2017 termination, as required under both ARRA and NDAA. *See* ARRA § 1553(c)(1)(B); 41 U.S.C. § 4712(c)(6)) (adopting burdens of proof under 5 U.S.C. § 1221(e)(1)). Rather, for the reasons previously discussed pertaining to the findings in Kletzkin's Report, the record contains clear and convincing evidence that MWAA "would have taken the action constituting the reprisal in the absence of the disclosure." *Id.*

---

[12] There is also a substantial issue whether the record is sufficient to show that a reasonable person would believe that Plaintiff's November 18, 2016 disclosure involved a "substantial and specific danger to public safety relating to the implementation or use of covered funds." *See* [Doc. No. 45-16], Affidavit of Bryan Norwood, ¶ 4–6 ("I do not regard an allegation regarding dissatisfaction with the actions of the Public Safety Communications Center in dispatching personnel or in providing information as concerning a substantial and specific danger to public health or safety, as I regard [such] allegation . . . as routine griping."). Given the other inadequacies in the record with respect to Plaintiff's NDAA and ARRA-based claims, the Court need not decide that issue.

Additionally, with respect to ARRA, there is no evidence sufficient to establish the activities that were the subject of the November 18, 2016 disclosure involved any "covered funds."[13]

Because Plaintiff has not sufficiently established that the funds relating to his whistleblowing complaint were related to the implementation or use of covered funds under either the NDAA or ARRA, and MWAA has sufficiently demonstrated with clear and convincing evidence that it would have terminated Plaintiff in the absence of his November 18, 2016 disclosure, Plaintiff's retaliation claims in Counts IV for retaliatory termination must be dismissed. For substantially the same reasons applicable to Count IV, as well as Count III, as outlined *supra* in Section III.B, Plaintiff's claim in Count V for retaliation based on a hostile work environment is insufficient as a matter of law and must be dismissed.[14] The relied upon conduct does not rise to the required level for actionable conduct; and there is clear and convincing evidence that MWAA would have imposed the relied upon adverse personnel actions in the absence of any protected activities.

---

[13] In his Amended Complaint, Plaintiff also alleges a protected ARRA disclosure in October 2016 to an MWAA Board Member about violations of ARRA regarding job posting and recruitment. Am. Compl. ¶ 26(f). However, Plaintiff has not supported that claim in his opposition to Defendant's Motion for Summary Judgment, in which Defendant contends that Plaintiff's only claimed disclosure under ARRA or NDAA occurred on November 18, 2016. Rather, Plaintiff invokes the protections under NDAA and ARRA beyond the November 18, 2016 disclosure, not based on affirmative disclosures, but because "he refused to endorse—for the sake of cooperation—actions taken by Mr. Potter or Mr. Vegliante that he viewed to be unlawful." Opposition Memorandum, at 28. This position fails to state a "disclosure" for the purposes of ARRA or NDAA as a matter of law.

[14] MWAA contends that Count V must be dismissed because a hostile work environment claim is not a recognized claim under either ARRA or NDAA and that in any event, Plaintiff failed to exhaust his administrative remedies as to this claim. [Doc. No. 45], at 30–31. Given the Court's dismissal of this claims on other grounds, it need not reach these issues.

## IV. CONCLUSION

For the above reasons, the Court concludes based on the undisputed facts that Defendant is entitled to judgment as a matter of law on Counts I, III, VI, and V of Plaintiff's Amended Complaint, and it is hereby

ORDERED that Defendant's Motion for Summary Judgment [Doc. No. 44] be, and the same hereby is, GRANTED; and it is further

ORDERED that Defendant's Motion *in Limine* [Doc. No. 53] be, and the same hereby is, DENIED as moot; and it is further

ORDERED that this action be, and the same hereby is, DISMISSED.

The Clerk is directed to forward copies of this Order to all counsel of record and to enter judgment in accordance with this Order pursuant to Fed. R. Civ. P. 58.

/s/
_____
Anthony J. Trenga
United States District Judge

November 4, 2019
Alexandria, Virginia